## DONALD LeCLAIR, JR., & others[1] *vs.* TOWN OF NORWELL.

Plymouth. October 4, 1999. - November 4, 1999.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Injunction. Practice, Civil,* Preliminary injunction. *Statute,* Construction. *Public Works,* Bidding procedure. *Contract,* Public works, Bidding for contract. *Municipal Corporations,* Contracts, By-laws and ordinances.

Discussion of the designer selection statute, G. L. c. 7, §§ 38A¹/₂-38O. [332-334]

There was no merit to a municipality's contention that it was not required to adhere to the specific provisions, including the public advertising requirement, of the designer selection statute, G. L. c. 7, § 38K (*a*) (i) - (iv), in awarding a contract for design of a public school renovation and construction project [334-335]; moreover, the municipal bylaws did not provide an exemption from public advertisement of such a proposal [335-337].

This court concluded that, in circumstances in which a municipality had violated the public notice provisions of the designer selection statute, G. L. c. 7, §§ 38A¹/₂ - 38O, and the public bidding provisions in the municipal bylaw, in connection with a design services contract for a school renovation and construction project, the public interest would not be served by entering an injunction voiding the contract that had been awarded, where the municipality had attempted, in good faith, to comply with the purposes of the statute and bylaw to provide an honest and open procurement system, and where delay in carrying out a contract would threaten funding opportunities and increase design and construction costs. [337-339]

CIVIL ACTION commenced in the Superior Court Department on May 14, 1999.

A motion for preliminary injunctive relief was heard by *Patrick F. Brady,* J., and a petition for relief from the order denying that motion was considered in the Appeals Court by *Barbara A. Lenk,* J.

---

[1]Martha LeClair; Ronald L. DePesa; Cheryl A. DePesa; George E. Jackman; Carol T. Jackman; Harold G. Simms; James F. Staples; Rita A. Staples; E. Arnold Joseph; Phyllis Haskell; Cecily D. Sullivan; Francis Sylvester; William B. Early, Jr.; Mary F. Knapp; Michael J. Knapp; Warren G. Ellis; William P. Lawrence; Ruth M. Lawrence; Daniel P. Ramsay; Joyce Balmes Oliver; Rosena McHardie; Linda R. Benting; and Robert W. Benting.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Diane C. Tillotson (Joseph L. Bierwirth, Jr.,* with her) for the plaintiffs.

*Ronald G. Busconi (Robert E. Galvin* with him) for the defendant.

*David J. Hatem, Jeffrey L. Alitz, & Ronald J. Snyder* for American Institute of Architects Massachusetts, amicus curiae, submitted a brief.

IRELAND, J. This is an appeal from the denial of a request for a preliminary injunction by several taxpayers of the town of Norwell pursuant to G. L. c. 40, § 53.[2]

The plaintiffs contend that the town violated the public notice provisions of the designer selection statute, G. L. c. 7, §§ 38A 1/2-38O, and the public bidding provisions of the town bylaws in connection with plans for a school renovation and construction project. The plaintiffs also claim that the town violated G. L. c. 40, § 15A, with respect to the town's proposed use of a piece of property that it purchased. We conclude that, while the town did not adhere to the letter of the designer selection statute or town bylaw, the public interest would not be served by entering a preliminary injunction.

1. *Background.* This dispute arose out of the town's attempt to address its inadequate school facilities. In 1997, the town formed the Norwell 2001 Committee to consider options for new school construction and renovation. On May 6, 1997, the town, at its annual town meeting, voted to raise and appropriate $100,000 for its school committee to contract for a facility audit and long range educational master plan (feasibility study).

The school committee, on June 17, 1997, prepared a "Request for Proposals for Master Planning Services" (RFP) seeking bids from registered architects and engineers to conduct the feasibility study. The RFP was advertised in the central register which described the project as "enrollment and facilities analysis with recommendations and estimated costs, thereof." The public notice indicated that RFP copies were available at the office of the superintendent of schools and that applications were due by

---

[2]General Laws c. 40, § 53, provides that ten taxpayers of a municipality may bring suit to enforce laws relating to the expenditure of tax money by local officials. See *Edwards* v. *Boston,* 408 Mass. 643, 646 (1990), and cases cited.

July 16, 1997. The notice also indicated that an informational briefing would be held on July 7, 1997, for interested bidders. The town prepared an advertisement of the RFP for publication in the Boston Globe newspaper; however, because of clerical oversight by the school department the notice was never published.

Twenty-seven design firms responded to the town's solicitation by seeking a copy of the RFP. Fourteen firms attended the informational briefing. At the meeting, one of the parties inquired whether the party selected to conduct the feasibility study would be permitted to conduct the design services contract for the school construction. In response, the town amended the RFP to inform bidders that it retained the right to select the party that conducted the feasibility study also to conduct the design services for the school construction.[3] The amendment was transmitted by facsimile and mailed, return receipt, to all twenty-seven designers who requested the RFP.

Ten design firms submitted proposals by the deadline. A designer selection committee appointed by the school committee evaluated the proposals based on a point system. The selection committee interviewed the top six candidates and identified three finalists: Tappé Associates, Inc. (Tappé); Earl R. Flansburgh & Associates; and the Design Partnership of Cambridge. After further investigation, the selection committee recommended Tappé to the school committee as the top design firm. On October 28, 1997, the town awarded the feasibility study contract to Tappé.

Tappé presented the feasibility study on June 22, 1998. Thereafter, the town retained Drummey Roseane Anderson, Inc., to conduct an independent review of the quality of Tappé's feasibility study. Drummey Roseane found that the study was reasonable and appropriate and concluded that, in accordance with G. L. c. 7, § 38H (*i*), Tappé could continue on the project. Following months of negotiations, the town awarded Tappé the construction design services contract.

---

[3]The amendment states: "The Norwell School Committee reserves the right to enter into negotiations with and to retain the selected planner subject to an independent review for follow-on services in accordance with the procedures set forth under M.G.L. Chapter 7. Notwithstanding the foregoing, the Norwell School Committee expressly reserves the right to separately procure design services from design professionals other than the planner upon completion of these Master Planning Services."

Also, at a special town meeting, on January 21, 1999, the town voted to appropriate $550,000 and authorize the board of selectmen to purchase a 13.19 acre parcel known as Osborne Farm. The warrant article approved at the town meeting authorized the purchase of the property for "municipal purposes." On May 13, 1999, the town acquired Osborne Farm by quitclaim deed.

Donald LeClair protested the award of the design contract to the office of the Attorney General pursuant to G. L. c. 149, § 44H. After a hearing, the Attorney General refused to invalidate the town's award of the design contract. LeClair and the other taxpayers then brought suit in the Superior Court seeking to invalidate the design services contract and prevent the town's proposed use of Osborne Farm. The judge denied the plaintiffs' motion for a preliminary injunction. A single justice of the Appeals Court affirmed the Superior Court judge's denial of relief but permitted the taxpayers to file an interlocutory appeal. We transferred the appeal to this court on our own motion.

2. *Standard of review.* In reviewing a denial of a request for a preliminary injunction, we determine whether the judge abused his discretion. *GTE Prods. Corp.* v. *Stewart*, 414 Mass. 721, 722 (1993). "An appellate court's role is to decide whether the [trial] court applied proper legal standards and whether there was reasonable support for its evaluation of factual questions." *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615 (1980), quoting *Hochstadt* v. *Worcester Found. for Experimental Biology*, 545 F.2d 222, 229 (1st Cir. 1976). The trial court's legal conclusions, however, are "subject to broad review and will be reversed if incorrect." *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 616, quoting *Buchanan* v. *United States Postal Serv.*, 508 F.2d 259, 267 n.24 (5th Cir. 1975).

3. *Standard for preliminary injunction.* When a private party seeks a preliminary injunction, the moving party is required to show that an irreparable injury would occur without immediate injunctive relief. *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 617. When, however, a suit is brought either by the government or a citizen acting as a private attorney general to enforce a statute or a declared policy of the Legislature irreparable harm is not required. *Edwards* v. *Boston*, 408 Mass. 643, 646-647 (1990). A judge, in these circumstances, must first determine whether there is a likelihood of success on the merits of a plaintiff's claims and then determine whether "the requested

order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 89 (1984). Moreover, where a statutory violation is alleged, the judge should specifically consider how the statutory violation affects the public interest. *Id.* General Laws c. 40, § 53, provides a mechanism for taxpayers to enforce laws relating to the expenditure of tax money by the local government. *Edwards* v. *Boston, supra* at 646. In cases brought under this statute, the taxpayers are acting as private attorneys general. *Id.* Thus, the taxpayers must show a likelihood of success on the merits and that the requested relief would be in the public interest. *Id.* at 646-647. First, we will evaluate the merits of the plaintiffs' claims and then we will turn to whether the public interest would benefit from entering a preliminary injunction.

4. *Designer selection statute.* General Laws c. 7, §§ 38A$\frac{1}{2}$-38O, is known as the designer selection statute. The statute was enacted in 1980 as a response to the report of the Special Commission Concerning State and County Buildings (Ward Commission). See generally Bockian, The Ward Commission Legislation, 25 B.B.J. No. 6 at 6 (1981). See also St. 1980, c. 579. The Ward Commission investigated corruption in the awarding of public construction projects and also made a comprehensive set of remedial legislative proposals. See Note, Prescribing Preventive Remedies for an Ailing Public Construction Industry: Reforms Under the New Massachusetts Competitive Bidding Statute, 23 B.C. L. Rev. 1357, 1358-1359 nn.9, 10 (1982).

The Legislature adopted a version of the Ward Commission recommendations regarding the award of designer services contracts. G. L. c. 7, §§ 38A$\frac{1}{2}$-38O. The designer services statute creates a design selection board which is responsible for selecting recipients of design service contracts for State agencies and authorities. § 38C. Among other requirements, the statute also creates a rigorous set of advertising requirements. § 38D.

The Legislature also incorporated the Ward Commission's view that municipal governments should not be subject to the same set of exhaustive requirements as State entities. See § 38K (*a*). In its recommendations to the Legislature, the Ward Commission recognized that "[a] tradition of local autonomy . . . makes mandatory use of the [design service board] unlikely to

meet with local acceptance." 7 Ward Commission Report at 243 (Final Report 1980). The Ward Commission also recognized that municipalities must use "certain minimum standards to assure selection based on merit." *Id.* In this case, we examine what "minimum standards" the Legislature requires municipalities to meet when awarding design services contracts. *Id.* Specifically, we address whether municipalities must strictly comply with the statute's public advertisement provision. See G. L. c. 7, § 38D.

(a) *Continuing-on provision.* The plaintiffs contend that the town violated its statutory obligation to advertise publicly the contract for designer services in a newspaper of general circulation. The town argues that, because it publicly advertised the feasibility study, it was not required to advertise publicly the follow-on design services contract.[4] In support of its contention, the town points toward § 38H (*i*) which permits cities and towns to allow a designer to continue on a project after conducting the feasibility study as long as the feasibility study is deemed adequate by an independent reviewer.[5] Read in isolation § 38H (*i*) appears to permit a town to award a design services contract to the party that conducted the feasibility study simply by authorizing an independent review of the quality of the feasibility study. We, however, do not read statutory language in isolation. "When the meaning of a statute is brought into question, a court properly should read other sections and should construe them together . . . ." *Pentucket Manor Chronic Hosp., Inc.* v. *Rate Setting Comm'n,* 394 Mass. 233, 240 (1985), citing *Holbrook* v. *Holbrook,* 1 Pick. 248, 250 (1822). When § 38H (*i*) is read in conjunction with § 38H (*d*), it is apparent that § 38H (*i*) has a relatively limited meaning. Section 38H (*d*) provides that a designer appointed to do a feasibility study is usually ineligible to perform the design services on the project; § 38H (*i*) expressly permits municipalities to contract for designers to continue on a project after completing the feasibil-

---

[4]On appeal, the plaintiffs do not contest the award of the feasibility study to Tappé as a violation of G. L. c. 7, § 38D.

[5]General Laws c. 7, § 38H (*i*), provides: "Awarding authorities in cities and towns may allow a designer who conducted a feasibility study to continue with the design of a project, provided that they shall commission an independent review, by a knowledgeable and competent individual or business doing such work, of the feasibility designer's work to insure its reasonableness and its adequacy prior to allowing such a designer to continue on said project."

ity study.[6] Section 38H (*i*) is designed to exclude cities and towns from the restrictions contained in § 38H (*d*). It does not contemplate exempting cities and towns from complying with other statutory bidding requirements.

(b) *Purpose and intent.* The town also contends that it is required to comply only with the designer selection statute's purpose and intent and is not required to adhere to any specific statutory provisions. A plain reading of G. L. c. 7, § 38K, belies the town's position.

Section 38K (*a*) provides that cities and towns must adopt written selection procedures that comply with the purpose and intent of the designer selection statute. It also provides that cities and towns must comply with certain specific provisions including the public advertisement provisions contained in § 38D.[7] While the section is drafted to provide cities and towns flexibility with most designer procurement decisions, the statute contemplates certain requirements that cities and towns must

[6]General Laws c. 7, § 38H (*d*), provides: "A designer or programmer appointed to do a feasibility study, master plan, or program for a project shall be ineligible for appointment to perform the design services for that project, unless the study, master plan, or program is limited to the repair, renovation, or the identification and correction of deficiencies in an already existing building or its equipment, and the fee for the combined study and design of repairs is less than one hundred thousand dollars."

[7]General Laws c. 7, § 38K (*a*), provides: "Every contract for design services for any building construction, reconstruction, alteration, remodeling, or repair estimated to exceed one hundred thousand dollars by any city, town, or agency, board, commission, authority or instrumentality thereof, other than housing authorities shall be awarded only after a selection procedure adopted in writing, prior to publication requesting applications, complying with the purposes and intent of sections thirty-eight $A^{1}/_{2}$ to thirty-eight O, inclusive, and the following requirements:

"(i) the provisions of section thirty-eight D regarding public notice;

"(ii) the establishment of uniform requirements of information to be submitted by all applicants, a uniform procedure for the evaluation of all applications to a group of not fewer than three finalists, and the opportunity to be afforded equally to all finalists to provide additional information to or to appear before the selection body;

"(iii) that a written explanation of the reasons for selection including the recorded vote if any was taken be made public and accompany the notification of award in the awarding authority's records;

"(iv) the provisions of paragraph (*c*) of section thirty-eight G regard-

follow. When statutory language is clear and unambiguous it must be construed as written. *Pyle* v. *School Comm. of S. Hadley*, 423 Mass. 283, 286 (1996). *Bronstein* v. *Prudential Ins. Co.*, 390 Mass. 701, 704 (1984).

Furthermore, our interpretation of § 38K (*a*) is in accord with the statute's legislative history. The Ward Commission Report recognized that cities and towns require flexibility when awarding contracts. 7 Ward Commission Report at 243 (Final Report 1980). However, the Ward Commission also listed six mandatory criteria that municipalities must follow.[8] The Legislature adopted most of these requirements as part of § 38K (*a*) including the public advertising requirement. The Legislature's drafting of § 38K (*a*) carefully tracks the Ward Commission's recommendations evidencing the Legislature's intent to grant cities and towns substantial flexibility, while assuring that they comply with the enumerated provisions listed in § 38K (*a*) (i)-(iv).

Thus, the designer selection statute does not forbid the town from selecting Tappé to conduct the design services for school construction after completing the feasibility study. However, in order properly to select Tappé for the project, the town should have both authorized an independent review of the feasibility study, § 38H (*i*), and publicly advertised the designer services project, § 38K (*a*) (i).

5. *Town bylaw.* The plaintiffs also contend that the town's decision to award the design services contract violated provisions of the town bylaws. Article VII of the town bylaws governs the award of town contracts. Section 1 provides that any contract except personal service contracts worth $1,000 or

---

ing the designation of fees in the contract;

"(v) that nothing in this section shall be interpreted to require the establishment of a board or to waive or reduce the requirements of any other applicable law or regulation."

[8]Specifically, the Ward Commission recommended that municipalities (1) advertise projects with a written description of the project with estimated costs, selection criteria and anticipated fees; (2) adopt written selection procedures before applications are received; (3) issue a public statement explaining the ranking of the applicants; (4) select the first ranked or issue a statement of why the first ranked was rejected; (5) state the fee as a total dollar amount in the contract; and (6) report to the public and State on the selection procedures used. 7 Ward Commission Report at 243 (Final Report 1980).

more must be competitively bid.[9] Section 4 provides that all goods or services contracts worth $10,000 or more shall be awarded through competitive bidding after the proposal is publicly advertised in at least one newspaper of general circulation in the town.[10] The town argues that the professional service exemption in § 1 applies to all of art. VII, thereby exempting the design services contract from § 4's public advertising provisions.

We disagree with the town's interpretation. Exceptions to statutory provisions are construed narrowly. *Singer Friedlander Corp.* v. *State Lottery Comm'n,* 423 Mass. 562, 565 (1996). Furthermore, specific language should not be added by the court when the drafters placed specific language in one section of a document and excluded it from another section. *School Comm. of Brockton* v. *Teachers' Retirement Bd.,* 393 Mass. 256, 263 (1984). After applying these traditional canons of statutory interpretation, we must conclude that, if the drafters meant to exclude all professional service contracts from the public advertising requirement, it would have placed such an exception within art. VII, § 4. Rather than providing a complete exemption from art. VII, the professional service exemption in § 1 creates a safe harbor provision so that the town need not competitively bid or advertise professional service contracts worth less than $10,000. Because of our interpretation of § 38H (*i*), under State law, follow-on design services are different projects than feasibility studies. Therefore, in order to comply fully with art. VII, § 4, of the town bylaws, the town should

---

[9] Article VII, § 1, of the town bylaws states: "No contract shall be awarded for any work or service other than professional service in the interest of the Town and no purchase of materials or equipment shall be made, the estimate cost of which in either case is $1,000.00 or more without invitation for competitive bids."

[10] Article VII, § 4, of the town bylaws states: "Invitations or proposals for goods and services shall meet the requirements and guidelines of the Mass. General Laws, when and where applicable. All goods or services in the amount of $10,000 or more shall be awarded through competitive bidding. Bids and proposals for $10,000 or more shall be publicly advertised by at least one insertion in at least one newspaper of general circulation in the Town of Norwell, such publication to be at least ten days before the opening of the bids. Whenever possible, contracts shall be awarded to the lowest responsible bidder. Any determination to the contrary must be made in good faith and the awarding authority shall file with the Town Clerk within 15 days a written statement ascribing the relevant, rational and reasonable grounds for selecting other than the lowest bidder."

have publicly advertised the design services proposal in a newspaper of general circulation.[11]

6. *The public interest.* We have concluded that the plaintiffs' claims have some merit. This determination is, however, only the initial step in the analysis. We now must examine whether the public interest would support entering an injunction or, in the alternative, whether an injunction would adversely affect the public. *Edwards* v. *Boston, supra* at 647. The Superior Court judge found that an injunction would harm the public interest and we agree.

In *Commonwealth* v. *Mass. CRINC, supra* at 89, we held that in evaluating the necessity of a preliminary injunction a court must consider how "statutory violations affect the public interest." The stated purpose of the designer selection statute is to ensure that "the commonwealth receives the highest quality design services . . . [and] provide safeguards for the maintenance of the integrity of the system for procurement of designers' services within the commonwealth." G. L. c. 7, § 38A½. When considering the effect on the public interest, we are mindful of the express purposes of the violated statute.

There is no evidence that the Legislature favors the voiding of contracts as the proper remedy for a violation of G. L. c. 7, §§ 38A½-38O. We have considered the proper remedy for violations of public construction statutes in *Middleton* v. *Deputy Comm'r of the Div. of Capital Planning & Operations*, 406 Mass. 1, 3-5 (1989), and *Brennan* v. *The Governor*, 405 Mass. 390, 394-395 (1989). In those cases, we addressed provisions of

---

[11]We reject the town's contention that the bylaw is void because it conflicts with the designer selection statute. Under our home rule provisions, municipal regulations are presumed valid and will only be invalidated when in conflict with the Constitution or a statute. *Take Five Vending, Ltd.* v. *Provincetown*, 415 Mass. 741, 744 (1993). A municipal regulation will be invalidated only (1) if there is an express legislative intent that there be no municipal regulation or (2) the local regulation would so frustrate the State statute as to warrant the conclusion that preemption was intended. *Connors* v. *Boston, ante* 31, 35-36 (1999). The town bylaw does not fail either prong of this test. In G. L. c. 7, § 38K (*a*) (v), the Legislature expressly stated that this statute should not "waive or reduce the requirements of any other applicable law or regulation." Thus, the Legislature permitted local ordinances regarding public bidding. Furthermore, the purpose of the designer selection statute is the procurement of quality design services. See G. L. c. 7, § 38A½. The town bylaws were also enacted to assure integrity in the bidding process and thus augment the purpose of the State statute. The town bylaw does not conflict with the designer services statute and is, therefore, valid.

G. L. c. 7, § 40, dealing with the creation and management of capital projects. These statutory provisions were also enacted as a result of the Ward Commission Report. See *Brennan* v. *The Governor, supra.* We noted that there was no suggestion that the Legislature intended any particular consequence to follow from a violation of Ward Commission legislation, and, therefore, the statutory provisions were not mandatory prerequisites to the State's proceeding with its public construction project. *Id.* Thus, we held that technical violations of the statute would not prevent the Commonwealth from proceeding with a capital project. *Middleton* v. *Deputy Comm'r of the Div. of Capital Planning & Operations, supra* at 5. Where there is no specific provision declaring contracts in violation of a statute void, and it is not necessary to void the contract in order to accomplish the purpose of the statute, the inference is that the statutory provision was intended to be directory and not prohibitory of the contract. See *Lawrence v. Falzarano,* 380 Mass. 18, 22-23 (1980); *Bowditch* v. *New England Mut. Life Ins. Co.,* 141 Mass. 292, 295 (1886).

Also enacted as part of the Legislature's response to the Ward Commission Report, the designer selection statute is similar to the capital projects statute considered in *Brennan* v. *The Governor, supra,* and *Middleton* v. *Deputy Comm'r of the Div. Of Capital Planning & Operations, supra.* Like the statutory provisions at issue in those cases, the designer selection statute does not mandate a specific remedy for a town's failure to comply with one of its provisions. Thus, the provisions of the statute are directory and do not require a court to void a contract unless the town has violated the statute's general mandate. The town developed its public advertising procedures based on its interpretation of § 38H (*i*). We recognize that the scope of § 38H (*i*) was somewhat ambiguous. Apparently, the town read § 38H (*i*) as classifying the feasibility study and design services contract as a single project, and concluded that one public advertisement would satisfy both the designer selection statute's and town bylaw's requirement for public notice. While the town's interpretation of the statute was erroneous, there is no evidence that the town acted in bad faith, that the integrity of the designer procurement system was compromised, or that the town was purposefully attempting to evade the town bidding

bylaw.[12] The town attempted to comply with the purposes of the designer selection statute and its bylaw to provide for an honest and open designer procurement system, and, thus, we have no reason to void the contract with Tappé.

Furthermore, to enter a preliminary injunction might do serious damage to the interests of the public. By delaying the design services contract, the town will likely be excluded from the priority list for State funding for school construction. If an injunction were entered, the town would lose or delay receipt of substantial grant funding, thereby potentially delaying school construction and increasing design and construction costs.

When balancing the equities, it is apparent that the public interest would not be served by entering an injunction. The purpose of the designer selection statute and the town bylaw is to create integrity in the designer procurement system. The town attempted to comply with this important purpose. To enter a preliminary injunction would halt an important school construction project without benefiting the public goal of a fair and equitable designer procurement system.[13]

The order denying the plaintiffs' motion for a preliminary

---

[12]No other contractor has come forward to suggest that it would bid on the designer services contract. Furthermore, the record reveals that the process employed by the town is consistent with the general expectations of industry firms and that there was ample community participation in the selection process.

[13]The plaintiffs made one additional claim of error. They claim that the town violated G. L. c. 40, § 15A, by using Osborne Farm for a school septic system. We disagree. General Laws c. 40, § 15A, requires a two-thirds vote by town meeting before a town board or officer can transfer land to another town department. *Harris* v. *Wayland*, 392 Mass. 237, 239 (1984). The plaintiffs argue that the town meeting authorized the purchase of Osborne Farm with an understanding that it was to be used as an athletic field. The warrant article passed at town meeting does not mention the athletic field. It authorizes the board of selectmen to purchase the property "for any municipal purposes or any other purposes the town sees fit." The warrant article is unambiguous. It provides the town with wide discretion for the use of Osborne Farm. Where the language of the warrant article is unambiguous we will not consider the history behind its passage. Cf. *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, 410 Mass. 686, 690 (1991) ("We will not . . . consider the legislative history . . . of the statute where its meaning is unambiguous"). Thus, the town was permitted to use the property for any municipal purpose including a school septic system without complying with the transfer provisions of G. L. c. 40, § 15A.

injunction is affirmed.

*So ordered.*