Brassard, J.
INTRODUCTION
Robert L. Mandell, Jacquelyn A. Mandell, Linda M. Phillips, Gary D. Phillips, John F. Russo, Susan J. Russo, Frederick O. Brown, Fancis A. Hagan, Lewis F. White, Kendra Cooper, Denis Linnane, John Rodriques, Cindy Rodrigues, William D. Rowe, Sandra Saltzman, Melvin F. Saltzman, Charles Pinkney, Winifred Robinson, Alvin A. Robinson, Jr., Susan M. Sur *616 ette, and Ronald J. Surette (the “Plaintiffs”) bring the present action pursuant to G.L.c. 40, §53 (the “Ten Taxpayer Statute”), to enjoin the Town of Reading (the “Defendant”) from spending additional taxpayer money in connection with a designer services and construction management contract for an elementary school renovation and construction project with Earl R. Flansburgh & Associates (“Flansburgh"). The Plaintiffs assert that they are entitled to summary judgment because there are (1) no disputed material facts, and (2) the Defendant entered into the contract with Flans-burgh in violation of G.L.c. 7, §§38A 1/2-380 (the “Designer Selection Statute”). In the alternative, the Plaintiffs renew their motion for preliminary injunction.
The Defendant moves for summary judgment and dismissal of the complaint. The Defendant argues that the Plaintiffs are not entitled to injunctive relief since (1) the Defendant complied with the purpose and intent of the Designer Selection Statute in good faith, (2) an injunction would not further the purposes of the Designer Selection Statute, and (3) granting the Plaintiffs injunctive relief would harm, rather than promote, the public interest.
For the following reasons, the Plaintiffs’ motion is DENIED and the Defendant’s cross-motion is ALLOWED.
BACKGROUND
The undisputed material facts are as follows. In May 1998, the Defendant, through the Reading School Building Committee (the “Building Committee”), issued a Request for Qualifications for Designer Services (the “1998 RFQ”) and published advertisements in the Central Register and the Reading Chronicle welcoming bids for an elementary school feasibility study. Plaintiffs’ Statement of Undisputed Facts and Points of Law in Support of their Motion for Summary Judgment (“Plaintiffs’ Statement of Facts”) at p. 1, ¶ 1 (citing Bierwirth Aff. Ex. A, B and C); see also Defendant’s Rule 9A(b)(5) Concise Statement of Undisputed Facts and Points of Law in Support of its Cross-Motion for Summary Judgment (“Defendant’s Statement of Facts”) at p. 2, ¶7 (citing Harutunian Aff. at ¶ 15). Subsequently, the Building Committee selected four architectural Arms, out of ten responses, to interview for the project. Plaintiffs’ Statement of Facts at p. 2, ¶3 (citing Bierwirth Aff. Ex. D); see also Defendant’s Statement of Facts at p. 2-3, ¶¶8-9 (citing Harutunian Aff. at ¶¶ 15-18). Flansburgh was ranked fifth and was also granted an interview due to concern about the top-ranked firm’s previous work conducted for the Defendant on a feasibility study pertaining to the high school. Plaintiffs’ Statement of Facts at p. 2, ¶3 (citing Bierwirth Aff. Ex. D); see also Defendant’s Statement of Facts at p. 3, ¶ 10. Prior to the interviews, the highest ranking firm withdrew from consideration and the other four firms, including Flansburgh, were interviewed. Id. (citing Bierwirth Aff. Ex. F and G).
Pursuant to a vote by the Building Committee on August 27, 1998, the Defendant awarded Flansburgh the feasibility study contract. Plaintiffs’ Statement of Facts at p. 3, ¶5 (citing Bierwirth Aff. Ex. G); see also Defendant’s Statement of Facts at p. 3, ¶ 11 (citing Harutunian Aff. at ¶20). At a town meeting on December 10, 1998, the Defendant authorized funds for new school construction, as well as funds for renovation and addition to the existing elementary school, Barrows School. Plaintiffs’ Statement of Facts at p. 3, ¶6 (citing Complaint at ¶29 and Answer at ¶29); see also Defendant’s Statement of Facts at p. 4, ¶16 (citing Harutunian Aff. at ¶24). However, on January 27, 1999 a referendum vote overturned the authorization for new construction, but upheld renovation and addition funds for the Barrows School. Plaintiffs’ Statement of Facts at p. 3, ¶7 (citing Complaint at ¶30 and Answer at ¶30); see also Defendant’s Statement of Facts at p. 4, ¶ 17 (citing Harutunian Aff. at ¶25). After the referendum vote, the Defendant did not immediately proceed with the approved renovation and addition to the Barrows School because the Department of Education would not approve funds without authorization for new construction as well. Plaintiffs’ Statement of Facts at p. 3, ¶8; see also Defendant’s Statement of Facts at p. 5, ¶19.
At a subsequent town meeting on November 15, 1999, the entire project was proposed again, and authorization was granted for construction of a new elementary school. Plaintiffs’ Statement of Facts at p. 4, ¶ 10; see also Defendant’s Statement of Facts at p. 5, ¶¶21-22. On January 11, 2000, a referendum vote upheld the authorization for construction of a new elementary school. Plaintiffs’ Statement of Facts at p. 4, ¶11 (citing Complaint at ¶35 and Answer at ¶35); see also Defendant’s Statement of Facts at p. 6, ¶24 (citing Harutunian Aff. at ¶30). Following the referendum vote, the Defendant intended to award a design services contract to Flansburgh, pending peer review of the feasibility study, without publicly advertising the contract or otherwise soliciting bids for the job. Plaintiffs’ Statement of Facts at p. 4, ¶ 12 (citing Complaint at ¶36 and Answer at ¶36); see also Defendant’s Statement of Facts at p. 6, ¶24 (citing Harutunian Aff. at ¶30).
On November 4, 1999, the Supreme Judicial Court issued its decision in LeClair v. Town of Norwell, 430 Mass. 328 (1999). Plaintiffs’ Statement of Facts at p. 4, ¶13; see also Defendant’s Statement of Facts at p. 6, ¶24. Flansburgh was involved with the feasibility study which gave rise to the LeClair decision. Plaintiffs’ Statement of Facts at p. 4, ¶13 (citing Bowen Deposition at p. 99). At some point thereafter, the Defendant became aware of the LeClair decision. Plaintiffs’ Statement of Facts at p. 4, HI 3 (citing Bowen Deposition at p. 99-100); see also Defendant’s Statement of Facts at p. 8, ¶31. At first, the Defendant, based on advice of counsel, did not believe that the LeClair case applied to its situation. Plaintiffs’ Statement of Facts at p. 4, *617 ¶13 (citing Harutunian Deposition at p. 134-35); see also Defendant’s Statement of Facts at p. 8, ¶34 (citing Harutunian Deposition at p. 134-35). In February 2000, the Defendant concluded that the LeClair decision required it to separately advertise the design contract. Plaintiffs’ Statement of Facts at p. 5, ¶13 (citing Bowen Deposition at p. 103); see also Defendant’s Statement of Facts at p. 9, ¶36 (citing Harutunian Aff. at ¶39). After conferring with the Attorney General’s Office regarding proper compliance with the Designer Selection Statute as interpreted by the LeClair decision, the Defendant published a notice of the second Request for Qualifications for Designer Services (the “2000 RFQ) in the Reading Chronicle and Central Register.[2] Defendant’s Statement of Facts at p. 9, ¶37 (citing Harutunian Aff. at ¶39); see also Plaintiffs’ Statement of Facts at p. 4-5, ¶13 (citations omitted).
During the same time period, sometime in February or March 2000, the architectural firm of Todd Lee-Clark-Rozas Associates, Inc. (“TLCR”) conducted a peer review of Flansburgh’s feasibility study and approved Flansburgh’s study. Defendant’s Statement of Facts at p. 8, ¶30 (citing Harutunian Aff. at ¶36); see also Plaintiffs’ Statement of Facts at p. 5, ¶ 14 (citations omitted). (Plaintiffs question the thoroughness of the peer review, but concede that one was provided by TLCR.) Additionally, during February 2000, due to the quickly approaching submission deadlines from the Department of Education, the Defendant accepted and approved a time and materials contract from Flans-burgh, with the understanding that such agreement was only valid in the event that Flansburgh received the design contract. Defendant’s Statement of Facts at p. 7, ¶¶27-28 (citations omitted); see also Plaintiffs’ Statement of Facts at p. 6, ¶15 (citations omitted).
Flansburgh was the only firm to submit a proposal in response to the 2000 RFQ and on March 27, 2000, the Building Committee voted to award the design services contract to Flansburgh. Plaintiffs’ Statement of Facts at p. 8, ¶¶19-20 (citing Bierwirth Aff. Ex. S and T); see also Defendant’s Statement of Facts at p. 9, ¶40 (citing Harutunian Aff. at ¶43). On March 24, 2000, Robert L. Mandell, Jacquelyn A. Mandell, Linda Phillips and Gary Phillips filed a bid protest pursuant to G.L.c. 149, §44H, challenging the selection process used by the Defendant to grant the design contract to Flansburgh. Plaintiffs’ Statement of Facts at p. 8, ¶21 (citing Bierwirth Aff. Ex. Y). On May 11, 2000, an Assistant Attorney General denied the bid protest. Plaintiffs’ Statement of Facts at p. 8, ¶22.
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); see also Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The record reveals that there are no disputed material facts in this case. Because Massachusetts law does not entitle the Plaintiffs to a permanent injunction, the Plaintiffs’ motion for summary judgment is denied and the Defendant’s cross-motion for summary judgment is granted.
The Plaintiffs incorrectly rely on East Side Const. Co. v. Town of Adams, 329 Mass 347 (1952), to support their assertion that there is a different standard for granting permanent injunctive relief under the Ten Taxpayer Statute, as compared to the standard for granting preliminary injunctive relief. Memorandum of Law in Support of Plaintiffs’ Motion for Summary Judgment or, in the Alternative, Renewed Motion for Preliminary Injunction (“Memorandum in Support of Plaintiffs’ Motion”) at p. 25-26. The Plaintiffs contend that East Side holds that the public interest is not considered with regard to the granting of injunctive relief under the Ten Taxpayer Statute. Id. at p. 26-27. The Plaintiffs also assert that East Side established that a showing of a violation of a statute which the Legislature enacted in order to protect the public interest, automatically entitles the Plaintiffs to permanent injunctive relief. Id. Thus, the Plaintiffs argue that they are entitled to permanent injunctive relief because the Defendant violated the Designer Selection Statute, and a permanent injunction is the only feasible remedy available. Id. at p. 27.
In East Side the issue which was addressed by the Supreme Judicial Court was whether plaintiffs must show actual harm resulting from the defendant’s violation of a statute in order to bring a ten taxpayer suit. East Side, 329 Mass. at 353. In East Side, the Court held that the fact that the town actually benefitted from the violation, and was not harmed, is irrelevant in determining whether plaintiffs may pursue a ten taxpayer suit. Id. “Petitioners need only show that they have been deprived of the protection the law has sought to afford.” Id. Despite the Plaintiffs contentions, East Side did not focus upon whether the granting of permanent injunctive relief would adversely affect the public interest. Therefore, East Side does not set forth the standard for the issuance of a permanent injunction in a ten taxpayer suit regarding a violation of the Designer Selection Statute.
The standard for granting permanent injunctive relief is the same as the test used for granting preliminary injunctive relief, except that “the movant must show actual success on the merits of the claim, rather than a mere likelihood of success.” K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989); see also Caroline T. v. Hudson School Dist., 915 F.2d 752, 755 (1st Cir. 1990). Further, the plaintiffs need not show irreparable harm when they are “the government or a citizen, acting as a private attorney general to enforce a statute or a declared policy of the Legislature.” LeClair, 430 Mass. at 331-32 (1999). In such circumstances, a court must first consider whether *618 the plaintiffs prevailed on the merits, and then determine whether injunctive relief will benefit or harm the public interest. Id. (citing Commonwealth v. Mass. CRINC, 392 Mass. 79, 89 (1984)). Hence, the public interest is a factor in this Court’s determination in whether to grant the Plaintiffs either preliminary or permanent injunctive relief.
In LeClair, although the Court found that the Town of Norwell had violated the Designer Selection Statute by not publicly advertising the design contract,[3] the public interest would not be best served by granting injunctive relief.[4] In its decision, the Court noted that “the judge should specifically consider how the statutory violation affects the public interest.” Id. at 332. Further, the purpose of the violated statute should be considered when considering the effect on the public interest. Id. at 337. In LeClair, the Court found that ”[t]he stated purpose of the designer selection statute is to ensure that ‘the commonwealth receives the highest quality design services . . . [and] provide safeguards for the maintenance of the integrity of the system for procurement of designers’ services within the commonwealth.’ ” Id. at 337 (quoting G.L.c. 7, §38A 1/2). Additionally, the Court found that “[t]here is no evidence that the Legislature favors the voiding of contracts as the proper remedy for a violation of G.L.c. 7, §§38A 1/2-380” and, in fact, there is no specific remedy mandated for a violation of the Designer Selection Statute. Id. at 337-38. Finally, the Court concluded that since there was no evidence that the Town of Norwell acted in bad faith in its failure to advertise the design contract, there was no reason to void the contract. Id. at 339. The Court specifically noted the harm to the public which would likely occur in the event it granted injunctive relief. Id. For example, “[b]y delaying the design services contract, the town will likely be excluded from the priority list for State funding for school construction” and “[i]f an injunction were entered, the town would lose or delay receipt of substantial grant funding, thereby potentially delaying school construction and increasing design and construction costs.” Id.
In the case at bar, although the Defendant did violate the Designer Selection Statute, such violation was not done in bad faith. Both parties agree that the Defendant did eventually advertise publicly for the design contract, and sought the advice of the Attorney General on this matter. Plaintiffs’ Statement of Facts at p. 7, HU16-17 (citations omitted); see also Defendant’s Statement of Facts at p. 9, ¶38 (citations omitted). The Plaintiffs do not claim fraud or deceit, but rather assert that the language in the advertisement did not satisfy the Designer Selection Statute. Plaintiffs’ Statement of Facts at p. 10, ¶5. This Court finds that although the Defendant’s advertisement was insufficient under the requirements of the Designer Selection Statute, and therefore constituted a violation of such statute, the Defendant did attempt to comply with the purposes of the Designer Selection Statute and the holding of LeClair.
Thus, the only consideration left to determine is whether the public interest would be benefited or harmed by granting a permanent injunction. If there is a delay to the construction and renovation project in Reading, the Defendant will be forced to resubmit its application to the Department of Education. Defendant’s Statement of Facts at p. 10, ¶42 (citing Bowen Aff. at ¶13). If Flansburgh is not ultimately awarded the design contract, the new designer will be unable to use Flansburgh’s designs and will have to prepare new schematic design documents and construction documents. Id. Further, the Defendant’s 2000 priority ranking for funding would be affected, thereby delaying reimbursement to the Defendant by the Department of Education. Id at p. 10, ¶43 (citing Bowen Aff. at ¶13).
According to the Defendant, a year long delay to the project will result in a $1.5 million increase in design and construction costs. Id. at p. 10, ¶44 (citing Bowen Deposition at p. 112-13). To date, the Defendant has paid Flansburgh $400,000, none of which would be eligible for reimbursement in the event that the Defendant is forced to recommence the designer procurement process. Id. at p. 10, ¶46 (citing Bowen Aff. at ¶ 13). Further, if injunctive relief is granted, the Defendant will have to resubmit its application for funding to the School Building Assistance Bureau (the “SBAB”), and pursuant to the new SBAB regulations, the rate of reimbursement to the Defendant could drop from 66% to 55%. Id. at p. 11, ¶48 (citing Bowen Deposition at p. 111).[5]
These financial considerations are similar to those examined by the Court in LeClair. In LeClair, the Court concluded that the delay to the school construction and increase in design and construction costs were significant harms which were not in the public interest. LeClair, 430 Mass. at 339. “To enter [an] . . . injunction would halt an important school construction project without benefiting the public goal of a fair and equitable designer procurement system.” Id. at 339. Additionally, further delay in the execution of the Defendant’s decision to build a new school and renovate another school will cause harm to the children and parents of Reading. Accordingly, in the instant case, this Court finds that the public interest would be harmed, rather than benefited, by granting permanent injunctive relief.
ORDER
For the foregoing reasons, it is hereby ORDERED that the Plaintiffs’ motion for summary judgment be DENIED and the Defendant’s cross-motion for summary judgment be ALLOWED.

The language of the advertisement, in part, was as follows:
That Feasibility Study was prepared pursuant to a contract arising from a May 12, 1998 Requests for Qualifications for Designer Services which RFQ had provided that the Reading School Building Committee as Awarding Authority reserves the right to continue, subject to independent review, with the selected designer beyond the Feasibility Study phase. The Awarding Authority was satisfied with the work performed by Earl R. Flansburgh & Associates, Inc. and after a satisfactory independent review had intended to enter into a contract with Earl R. Flansburgh & Associates, Inc. for the design and construction administration of these projects. However, as a result of the decision of the Supreme Judicial Court in the case of LeClair, etal. v. Town of Norwell, the Awarding Authority is publicly advertising this request for qualifications for designer services, although Earl R. Flansburgh & Associates, Inc. remains eligible for award of the contract. Plaintiffs' Statement of Facts at p. 7, ¶16 (citing Bierwirth Aff. Ex. O, P. and Q).

The Town of Norwell had publicly advertised for the feasibility contract, but neglected to independently advertise for design services. LeClair, 430 Mass. at 333.

In LeClair, the plaintiffs requested preliminary injunctive relief to remedy the statutory violation.

The Court also notes that the delay to this project has cost the Defendant a significant amount of money in interest, approximately $359,550, which could have been used to offset the expense of borrowing money for the project. Id. at p. 11, ¶¶49-53 (citations omitted). Pursuant to federal regulations, the Defendant is entitled to borrow money for this project on a tax free basis, so long as it spends the borrowed funds within a certain time frame. Defendant’s Statement of Facts atp. 11, ¶49 (citing Klepeis Aff. at ¶3). Specifically, the Defendant must spend 10% of the borrowed money the first year, 75% of the borrowed money within the first 18 months, and 100% of the borrowed money within the first two years. Id. According to these regulations, the Defendant would be allowed to invest the borrowed funds and keep the interest. Id. (citing Klepeis Aff. at ¶4). The Defendant had planned to borrow $12,858,000 in July 2000 and the Flansburgh plan required an expenditure of $873,000 between July and December 2000, thus leaving $11,985,000 to invest. Id. (citing Klepeis Aff. at ¶6). At an interest rate of 6% for these six months, the Defendant would have had an opportunity to earn $359,550 to help offset the cost of borrowing the money for the project. Id. at p. 11, ¶53 (citing Klepeis Aff. at ¶7).