KIRT FORDYCE & others[1] *vs.* TOWN OF HANOVER & others.[2]

Suffolk. March 1, 2010. - July 9, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Public Works,* Bidding procedure, General contractor. *Contract,* Public works, Construction contract, Bidding for contract. *Fraud. Practice, Civil,* Preliminary injunction, Interlocutory appeal.

This court concluded that for purposes of G. L. c. 149, § 44D½ (*h*) (which states that the decision of a committee tasked with prequalifying bidders for a public construction project shall not be subject to appeal except on grounds of, inter alia, fraud), "fraud" means a fraudulent misrepresentation by a general contractor applying for prequalification that the committee relied on to its detriment in qualifying the general contractor to bid, and that in the absence of detrimental reliance by the committee, a general contractor's intentional misrepresentation, even if intended to deceive the committee, does not constitute "fraud" within the meaning of the statute, and therefore does not require that the committee's prequalification of the contractor be vacated. [256-266]

In a civil action arising from the defendant town's award of a contract for the construction of a high school, a judge in the Superior Court erred in issuing a preliminary injunction ordering the town and a general contractor to cease work on the school pending a trial on the merits of the plaintiffs' claim that the contract had been entered into in violation of the public bidding statutes because the general contractor had made intentional misrepresentations to the town's prequalification committee regarding its experience in school building projects, where there was no allegation that any member of the town's prequalification committee (committee) acted corruptly in deciding to prequalify the general contractor; where there was unrefuted evidence that the committee did not act in reliance on any of the alleged misrepresentations; and where the town wished to proceed with the contract. [266-267]

CIVIL ACTION commenced in the Superior Court Department on November 9, 2009.

[1]John Robison, Brian Feinstein, Stephen O'Brien, David Kleimola, William Bzdula, David Ferris, Sean Freel, Peter Serighelli, and Gerard McCann.

[2]Callahan, Inc. (Callahan), whose motion to intervene was allowed in the Superior Court; and the Commonwealth, whose motion to intervene was allowed in this court.

After a motion for preliminary injunction was heard by *Richard J. Chin*, J., a proceeding for interlocutory review was heard in the Appeals Court by *David A. Mills*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Kevin Conroy*, Assistant Attorney General, for the Commonwealth.

*Christopher N. Souris* for the plaintiffs.

*James A. Toomey* (*Bryan R. LeBlanc* with him) for town of Hanover.

*Paul W. Losordo* for Callahan, Inc.

The following submitted briefs for amici curiae:

*Patrick J. Sullivan* & *James G. Grillo* for TLT Construction Corp.

*Donald J. Siegel* & *James A.W. Shaw* for Foundation for Fair Contracting of Massachusetts & another.

*Joel Lewin* & *Robert V. Lizza* for Construction Industries of Massachusetts, Inc., & another.

*Christopher J. Petrini, Peter L. Mello,* & *Thomas J. Urbelis* for City Solicitors and Town Counsel Association.

*Stanley A. Martin* & *Edwin L. Hall* for Associated General Contractors of Massachusetts.

*Christopher A. Kenney* & *Michael P. Sams* for Associated Builders and Contractors, Inc.

GANTS, J. This case comes to us on appeal from an order of a single justice of the Appeals Court vacating a preliminary injunction issued by a judge in the Superior Court against the town of Hanover (town) and Callahan, Inc. (Callahan), a general contractor with whom the town has entered into a contract for the construction of a new high school. The injunction ordered the town and Callahan to cease further work on the school pending a trial on the merits of the plaintiffs' claim that the contract had been entered into in violation of the public bidding statutes, G. L. c. 149, §§ 44A-44H, because Callahan had made intentional misrepresentations to the town's prequalification committee regarding its experience in school building projects. We affirm the order of the single justice, though on different grounds from those expressed in his order. Although a con-

tractor's intentional misrepresentation in seeking prequalification may allow an awarding authority to terminate a previously awarded contract, we conclude that where, as here, there is no allegation that any member of the town's prequalification committee acted corruptly in deciding to prequalify Callahan, there is unrefuted evidence that the committee did not act in reliance on any of the alleged misrepresentations, and the town wishes to proceed with the contract, the motion judge committed an error of law in issuing a preliminary injunction requiring the town to cease further work on the school.[3]

1. *Background.* Under G. L. c. 149, § 44A (2) (D), contracts for the construction of public buildings that are estimated to cost more than $100,000 may only be awarded to "the lowest responsible and eligible general bidder" on the basis of competitive bids and in conformity with procedures set forth in §§ 44A-44H. Where, as here, a public construction project has an estimated cost in excess of $10 million, a general contracting firm must satisfy two requirements to be deemed a "[r]esponsible" and "[e]ligible" bidder. G. L. c. 149, § 44A (1). First, the contractor must hold a certificate of eligibility, issued by the commissioner of the division of capital asset management and maintenance (DCAM), showing that the firm has the expertise and financial capacity to perform the work required. G. L. c. 149, §§ 44A (2) (D), 44D (1) (a). Second, the contractor must be prequalified to bid on the project by a four-member committee of the awarding authority, that is, the agency, municipality, or other governmental authority awarding the contract,[4] based on the contractor's responses to questions contained in a written request for qualifications (RFQ) issued by the committee. G. L. c. 149, § 44D½ (a) & (c).

While the questions that must be asked in the RFQ and the potential points to be awarded in each category of questions are

---

[3]We acknowledge amicus briefs filed by the Attorney General; Associated Builders and Contractors, Inc.; the Associated General Contractors of Massachusetts; the City Solicitors and Town Counsel Association; Construction Industries of Massachusetts, Inc., and Utility Contractors Association of New England, Inc.; Foundation for Fair Contracting of Massachusetts and Brockton & Vicinity Building Trades Council; and TLT Construction Corp.

[4]"The prequalification committee shall be comprised of 1 representative of the designer and 3 representatives of the awarding authority." G. L. c. 149, § 44D½ (c).

specified by statute, the relative value assigned to each individual question and the scoring of contractor responses is committed to the discretion of the prequalifying committee.[5] This allows a prequalification committee to evaluate a general contractor's experience and qualifications in light of the specific needs of the particular project for which the awarding authority will be soliciting bids. G. L. c. 149, § 44D$^{1}/_{2}$ (*a*)-(*h*). Only general contractors whose responses to the RFQ receive a score of seventy points or more may be prequalified by the committee, and only prequalified contractors may be invited to submit bids on the project. G. L. c. 149, § 44D$^{1}/_{2}$ (*h*). "The prequalification committee shall select a minimum of [three] qualified general contractors to submit bids . . . ." *Id.* Section 44D $^{1}/_{2}$ (*h*) protects the considerable discretion vested in the prequalification committee by providing that all decisions of the committee "shall be final and shall not be subject to appeal except on grounds of arbitrariness, capriciousness, *fraud* or collusion" (emphasis added). *Id.*

In conformity with these statutory requirements, in May, 2009, the town issued a RFQ inviting interested general contractors to submit statements of qualification (SOQs) to prequalify to bid on the construction of a new high school. Eleven general contractors submitted SOQs by the June 5 deadline, and on July 6, the town reported the results of the committee's evaluation in a public register. Callahan was one of nine applicants prequalified by the committee to submit formal bids on the project.

---

[5]The statute instructs each awarding authority issuing a request for qualifications (RFQ) to solicit information in four specified categories and to assign points among the first three categories according to a fixed formula: (1) management experience (fifty points); (2) references (thirty points); (3) capacity to complete projects (twenty points). G. L. c. 149, § 44D$^{1}/_{2}$ (*e*). The awarding authority is instructed to use its own discretion in allocating points within each of these categories and in evaluating and scoring contractor responses. G. L. c. 149, § 44D$^{1}/_{2}$ (*e*), (*h*). The fourth category, for which no points are awarded, requires applicants to submit: (1) a commitment letter for payment, and performance bonds in the full estimated value of the contract from a surety company licensed to do business in the Commonwealth and approved by the United States Treasury Department; and (2) a certificate of eligibility from the division of capital asset management and maintenance (DCAM) demonstrating that the contractor has a capacity rating commensurate with the size and scope of the project, as well as an update statement with the information required under G. L. c. 149, § 44D (1) (*a*). G. L. c. 149, § 44D$^{1}/_{2}$ (*e*).

General bids were opened by the town on September 11. Callahan was the low bidder, with a base price of $37,099,999. The next low bidder was almost one million dollars higher.[6]

On September 17, 2009, N.B. Kenney Company, Inc., a heating and air conditioning subcontractor whose subbid had not been adopted in Callahan's winning general bid, filed a bid protest with the Attorney General, who is charged with enforcement of the competitive bidding statutes. See G. L. c. 149, § 44H. The Attorney General also received bid protests from J & J Contractors, Inc., the second lowest bidder among the general contractors, and from the Laborers' New England Region Organizing Fund. The protesters alleged that the committee's decision to prequalify Callahan was obtained through fraud because Callahan's SOQ contained misrepresentations of the firm's prior construction experience that were intended to mislead the committee. Consequently, they argued, Callahan should have been disqualified as an eligible bidder, and the town should be prohibited from entering into a contract with Callahan. Following the filing of the protests, the town requested and received additional information from Callahan about the representations made in its SOQ concerning the company's prior construction experience.

In response to the bid protests, the Attorney General undertook an investigation and asked the town to refrain from awarding the contract or commencing work on the project while her investigation was ongoing. On September 24, however, the town issued Callahan a notice to proceed. At the bid protest hearing later that month, the Attorney General requested that the town suspend further work on the project pending her determination of the bid protests on the merits. Notwithstanding these requests, the town entered into a general contract with Callahan on or about October 15 and proceeded with construction. Two weeks later, on October 30, the Attorney General issued a decision which essentially confirmed the allegations of the bid protestors.

The Attorney General concluded that Callahan had committed "fraud" within the meaning of G. L. c. 149, § 44D½ (h), by knowingly misrepresenting material facts in its SOQ with

---

[6]The project specifications allowed for certain alternate design elements above the base plan. Callahan was also the winning bidder when estimates were considered with the alternate design elements included.

the intention of misleading the prequalifying committee. The Attorney General found that Callahan had misleadingly identified itself in its SOQ as the "successor corporation" to another general contracting company, J.T. Callahan & Sons, Inc. (JTC). In fact, although many of the senior managers of Callahan were former employees of JTC, Callahan had been incorporated independently, JTC continued to survive as a corporation, and the two companies shared no corporate officers. According to the Attorney General, the effect of this misrepresentation was to permit Callahan in its SOQ to claim JTC's experience in building seventy-five schools in Massachusetts over the preceding twenty years, when Callahan itself lacked this kind of project experience. More specifically, where the SOQ required a listing of "Similar Project Experience" undertaken by the firm in the last five years, defined by the prequalification committee to mean construction of "phased educational facilities," the only educational facility Callahan included was North Andover High School, a $42 million project completed in 2005.[7] In fact, JTC had been the general contractor on this project and had completed nearly all of the work before running into financial difficulties. In order to finish the project, the insurance company serving as JTC's surety recommended the formation of a new corporate entity, Callahan, which employed former JTC personnel and in effect acted as a subcontractor for JTC. Under this arrangement, Callahan completed the final $1.2 million of work on the $42 million project, comprising three per cent of the school's total construction cost. The Attorney General also found that Callahan had made selective use of JTC's prior history in its SOQ: while Callahan took credit for JTC's work on the North Andover High School project and its almost twenty years of public construction experience, Callahan did not list the North Andover High School project where the SOQ required disclosure of projects the applicant had failed to complete, and Callahan similarly failed to disclose pending or adversely concluded legal proceedings against JTC, although the SOQ also called for this information.

Based on these findings, the Attorney General concluded that

_____

[7]Callahan also included five residential projects and one project on a university campus, none of which fell within the definition of "Similar Project Experience" specified by the statement of qualification (SOQ).

Callahan should not have been prequalified by the committee, and as a consequence, that Callahan should not have been awarded the contract. When the town made no move to halt construction or terminate its contract with Callahan following the Attorney General's announcement of her bid protest decision, the plaintiffs, ten taxable inhabitants of the town, brought suit in the Superior Court under G. L. c. 40, § 53, seeking temporary and permanent injunctive relief to restrain the town from making payments to Callahan under the contract and to require the town to rescind the contract.[8],[9] The plaintiffs alleged that Callahan had committed fraud during the mandatory bidder prequalification procedure, that its fraud effectively voided the decision of the prequalification committee under G. L. c. 149, § 44D½ (h), and that, because Callahan could no longer be considered a "responsible and eligible bidder," the town's award of the contract to Callahan was unlawful under G. L. c. 149, § 44A (2).

After a nonevidentiary hearing on November 16, 2009, the motion judge allowed the plaintiffs' motion for a preliminary injunction and ordered the town and Callahan to cease further construction of the school pending a trial on the merits. In reaching his decision, the judge held that, in contrast to common-law fraud, there is no requirement of detrimental reliance to prove fraud under G. L. c. 149, § 44D½ (h). Relying principally on the reasoning of earlier bid protest decisions issued by the Attorney General, the judge concluded that, to succeed on the merits in their effort to overturn the decision of the prequalifying committee under § 44D½ (h), the plaintiffs need only establish that "(1) Callahan made statements or omissions relating to a material fact, (2) that had the tendency to be relied upon by or to influence the average person, (3) that were knowingly false or misleading, and (4) were intended to mislead the prequalification committee or awarding authority." After setting forth this standard for fraud under the statute, the judge found that the plaintiffs had

---

[8]General Laws c. 40, § 53, provides that ten taxable inhabitants of a municipality may bring suit to enforce laws relating to the expenditure of public funds by local officials. See *Edwards* v. *Boston*, 408 Mass. 643, 646 (1990), and cases cited.

[9]N.B. Kenney Company, Inc. (Kenney), one of the parties who had filed a bid protest with the Attorney General following Callahan's selection as the winning bidder, filed a separate suit and was a party to the proceedings in the Superior Court and before the single justice.

shown a reasonable likelihood of prevailing on the merits at trial because Callahan's misrepresentation of its prior construction experience on the North Andover High School project, together with its failure to mention in the SOQ that JTC had failed to complete that project, were "highly suggestive" of Callahan's intent to deceive the prequalification committee. The judge also concluded that the public interest favored the issuance of a preliminary injunction, because "[t]he inconvenience and expense caused by the delay in the construction of the school is of significantly less importance than ignoring this type of disregard for the competitive bidding statute."[10]

Presumably because he deemed it irrelevant under his interpretation of the meaning of fraud under G. L. c. 149, § 44D$^{1/2}$ (h), the judge did not address unrefuted evidence in the record that the prequalification committee had not been misled by the misrepresentations in Callahan's SOQ and had not relied on them to its detriment. Affidavits submitted by two members of the four-person committee stated that, before the committee prequalified Callahan to bid, the committee members knew and had discussed the true nature of the relationship between Callahan and JTC, and were aware that JTC, not Callahan, had done the great majority of the work on North Andover High School. The committee's consideration of this information is reflected in the fact that it awarded Callahan two out of a possible ten points for similar project experience.

The defendants sought relief from a single justice of the Appeals Court under G. L. c. 231, § 118, first par. In reviewing the motion judge's grant of the preliminary injunction, the single justice adopted the judge's factual findings as well as his interpretation of the meaning of fraud under G. L. c. 149, § 44D$^{1/2}$ (h). The single justice agreed that the plaintiffs had demonstrated a likelihood of success on the merits, but he determined that the

---

[10]Where, as here, a suit is brought by citizens acting as private attorneys general to enforce a statute or a declared policy of the Legislature, a showing of irreparable harm is not required for the issuance of a preliminary injunction. *LeClair* v. *Norwell*, 430 Mass. 328, 331-332 (1999). In these circumstances, a judge instead must first determine whether the plaintiffs have shown a likelihood of success on the merits of the asserted claim and then determine whether "the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Id.*, quoting *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 89 (1984).

motion judge had "insufficiently considered the fact that enjoin-
ing performance on the contract will shut down the project for
several months (or longer) as the town sorts through the bid
protests and conducts the re-bidding process. . . . [S]hutting
down this project will result in substantial cost for the town." He
concluded that "the judge's failure to place these factors on the
scale governing preliminary injunctive relief resulted in an abuse
of discretion," and he vacated the preliminary injunction.

The plaintiffs appealed from the single justice's order to the
full Appeals Court, Mass. R. A. P. 3 (a), as amended, 378 Mass.
927 (1979),[11] and we transferred the case here on our own
motion.[12]

2. *Standard of review.* In reviewing the allowance of a pre-
liminary injunction, whether that review is conducted by a
single justice of the Appeals Court pursuant to G. L. c. 231,
§ 118, first par., or by an appellate court reviewing a decision
of the single justice, the standard is whether the *motion* judge
abused his discretion in issuing the preliminary injunction. See
*Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*,
406 Mass. 701, 709 & n.7, 717 (1990) (vacating suspension of
preliminary injunction ordered by single justice); *Packaging
Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615 (1980) (standard
of review framed in terms of abuse of discretion). In conducting
our review, we decide "whether the judge applied proper legal
standards and whether there was reasonable support for his evalu-
ation of factual questions." *Commonwealth* v. *Fremont Inv. &
Loan*, 452 Mass. 733, 741 (2008). See *Packaging Indus. Group,
Inc.* v. *Cheney*, *supra*. On review, the motion judge's "conclu-
sions of law are subject to broad review and will be reversed if
incorrect." *Id.* at 616, quoting *Buchanan* v. *United States Postal
Serv.*, 508 F.2d 259, 267 n.24 (5th Cir. 1975).

3. *Discussion.* The motion judge did not abuse his discretion
in finding from the circumstantial evidence that Callahan know-
ingly made false or misleading statements of material fact in the

[11]The defendants each filed cross appeals as to specific conclusions reached
by the single justice but not as to his decision that the preliminary injunction
should be vacated.

[12]Kenney also appealed from the order of the single justice to the full Ap-
peals Court but withdrew its appeal prior to oral argument before this court.

SOQ with the intention of misleading the prequalification committee. Therefore, in determining whether the judge abused his discretion in finding that the plaintiffs were likely to prevail at trial, the key issue is whether the judge was correct as a matter of law in concluding that Callahan's intentional misrepresentations constituted fraud within the meaning of G. L. c. 149, § 44D$^1$/$_2$ (*h*), even in the absence of evidence of detrimental reliance by the prequalification committee. We conclude that he erred.

Fraud is not a defined term under G. L. c. 149, § 44D$^1$/$_2$ (*h*), and no appellate court of the Commonwealth has previously decided any claim involving this statute. Under the common law, fraud is a knowing false representation of a material fact intended to induce a plaintiff to act in reliance, where the plaintiff did, in fact, rely on the misrepresentation to his detriment. See *Masingill* v. *EMC Corp.*, 449 Mass. 532, 540 (2007); *Barrett Assocs.* v. *Aronson*, 346 Mass. 150, 152 (1963). As earlier noted, in bid protest decisions issued pursuant to her authority under G. L. c. 149, § 44H, to enforce compliance with the competitive bidding statutes, the Attorney General has asserted that proof of fraud under G. L. c. 149, § 44D$^1$/$_2$ (*h*), does not require the element of detrimental reliance. See, e.g., Matter of Everett High Sch. Elec. Subcontract, Att'y Gen. Bid Protest Decision (Nov. 2, 2006); Matter of Police Headquarters and East Fire Station, Att'y Gen. Bid Protest Decision (Aug. 10, 2006). However, these bid protest decisions, because they arise from the Attorney General's prosecutorial, rather than her adjudicative, function, carry no precedential weight. See *Brasi Dev. Corp.* v. *Attorney Gen.*, 456 Mass. 684, 694 (2010); *Annese Elec. Servs, Inc.* v. *Newton*, 431 Mass. 763, 771 (2000). See also *E. Amanti & Sons* v. *R.C. Griffin, Inc.*, 53 Mass. App. Ct. 245, 253 (2001); *Department of Labor & Indus.* v. *Boston Water & Sewer Comm'n*, 18 Mass. App. Ct. 621, 623-624 n.7 (1984).

To determine the meaning of "fraud" as used in G. L. c. 149, § 44D$^1$/$_2$ (*h*), we look to the intent of the Legislature "ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Industrial Fin. Corp.* v.

*State Tax Comm'n*, 367 Mass. 360, 364 (1975), quoting *Hanlon
v. Rollins*, 286 Mass. 444, 447 (1934). We do not read statutory
language in isolation. *LeClair* v. *Norwell*, 430 Mass. 328, 333
(1999). "Where possible, we construe the various provisions of a
statute in harmony with one another, recognizing that the
Legislature did not intend internal contradiction." *DiFiore* v.
*American Airlines, Inc.*, 454 Mass. 486, 491 (2009). In a case
such as this, where the meaning of a single word in a statute is at
issue, we generally infer that the Legislature intended the word
be interpreted in accordance with its "ordinary and approved
usage." *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.*, 449
Mass. 444, 454 (2007). Where a statute employs a word with an
established meaning in the common law, we consider the statute
in light of that meaning, and we do not construe the statute as
"effecting a material change in or repeal of the common law un-
less the intent to do so is clearly expressed." *Id.*, quoting *Riley* v.
*Davison Constr. Co.*, 381 Mass. 432, 438 (1980). See *Busalacchi*
v. *McCabe*, 71 Mass. App. Ct. 493, 497 (2008) ("Without a clear
expression from the Legislature breaking with the common law,
the common law will apply"). Nowhere in G. L. c. 149, §§ 44A-
44H, does the Legislature direct us to disregard the well-settled
common-law meaning of fraud in interpreting and applying
§ 44D½ (*h*) which, in the context of an intentional misrepresenta-
tion, requires detrimental reliance.

Notwithstanding these familiar principles of statutory construc-
tion, the plaintiffs, the Attorney General, and the two judges
who ruled on the injunction concluded that the Legislature
intended that a contractor's intentional misrepresentation would
constitute the fraud necessary to vacate a decision of a prequali-
fying committee under § 44D½ (*h*), even where the contractor's
deception falls short of common-law fraud. The plaintiffs contend
that this conclusion is compelled by the objectives of the com-
petitive bidding statutes, G. L. c. 149, §§ 44A-44H. A careful
examination of the evolution of these statutes, however, reveals
that, in the context of a claim of intentional misrepresentation,
defining fraud under § 44D½ to mean common-law fraud, as the
defendants contend, respects the Legislature's purpose in enact-
ing § 44D½ and is consistent with the over-all objectives of the
competitive bidding statutes.

The basic framework of the Commonwealth's contemporary

competitive bidding statutes was created thirty years ago when the Legislature repealed the previously enacted public construction statute and adopted a series of amendments that extensively revised the Commonwealth's system of public construction. See St. 1980, c. 579, § 55. See also St. 1984, c. 484, § 46. These revisions were undertaken in response to a report issued by the Special Commission Concerning State and County Buildings chaired by Amherst College President John William Ward (Ward Commission), which documented extensive corruption in the awarding of public construction contracts and proposed comprehensive remedial legislation. See *LeClair* v. *Norwell, supra* at 332; *Modern Cont. Constr. Co.* v. *Lowell,* 391 Mass. 829, 832 n.5 (1984). Accordingly, the statute enacted in 1980 states as its purpose the creation of a system of public construction which will provide fair costs, professionalism, and accountability, and which will "reduce[] opportunities for corruption, favoritism, and political influence in the award and administration of public contracts." St. 1980, c. 579, Preamble. The statute is intended "not only to ensure that the awarding authority obtain the lowest price among responsible contractors, but also to establish an open and honest procedure for competition for public contracts." *Modern Cont. Constr. Co.* v. *Lowell, supra* at 840.

The competitive bidding statutes in effect before 1980, as they do today, required that public construction contracts be awarded to the "lowest responsible and eligible bidder,"[13] but prior to the reform undertaken following the Ward Commission report, there were no useful statutory or regulatory criteria for what constituted a responsible and eligible bidder and no centralized system to monitor and document the competency and integrity of contractors undertaking public construction projects.[14] See 8 Ward Commission Report at 343-346 (Final Report 1980); Note, Prescribing Preventive Remedies for an Ailing Public Construction Industry: Reforms Under the New Massachusetts Competitive Bidding

---

[13]Compare G. L. c. 149, § 44A, as amended through St. 1977, c. 968, with G. L. c. 149, § 44A, as appearing in St. 1980, c. 579, § 55.

[14]The only guidance given in the earlier statute was that a "responsible and eligible bidder" was a bidder "possessing the skill, ability and integrity necessary to the faithful performance of the work and who shall certify that he is able to furnish labor that can work in harmony with all other elements of labor employed or to be employed on the work." G. L. c. 149, § 44A, as appearing in St. 1956, c. 679, § 1. See G. L. c. 30, § 39M.

Statute, 23 B.C. L. Rev. 1357, 1359-1364 (1982) (Note). It was instead left to each awarding authority, at its option and without the benefit of guidelines issued by an expert authority, to solicit information from prospective contractors that might allow it to determine whether a bidder firm was competent to perform the work under consideration in an honest and professional manner. See G. L. c. 149, § 44A, as appearing in St. 1956, c. 679, § 1 ("Essential information in regard to such qualifications shall be submitted in such form as the awarding authority may require"); 8 Ward Commission Report, *supra*; Note, *supra*. Because the law required that contracts be awarded to the lowest bid received from a "responsible and eligible bidder," but provided minimal guidance for determining whether a bidder was "responsible and eligible," the result too often was that all bidders were deemed "responsible and eligible," regardless of their competency or experience, and the selection of a contractor was based solely on price. This resulted in a widespread problem of defective construction work requiring extensive repair. See Note, *supra* at 1365.

Beginning with the Ward Commission legislation enacted in 1980, the Legislature required bidders to provide specified information regarding their competence and experience to the awarding authority, which the awarding authority was required to evaluate "according to procedures and criteria which the deputy commissioner [of DCAM[15]] shall prescribe by regulations or guidelines."[16] G. L. c. 149, § 44D (3), as appearing in St. 1980, c. 579, § 55. In 1984, the Legislature transferred responsibility for determining whether a bidder was "responsible and eligible" to DCAM. G. L. c. 149, § 44D (3), as appearing in St. 1984, c. 484, § 46. Any bidder for a public construction contract now must submit as part of the bid process a certificate of eligibility from the commissioner of DCAM showing that the bidder has the classification and capacity rating to complete the project on which it is bidding. G. L. c. 149, § 44D (1) (*a*). Certificates of

[15]At the time of the 1980 and 1984 legislation, the agency was known as the division of capital planning and operations. In 1990, it was changed to the division of capital asset management and maintenance (DCAM). St. 1998, c. 194, §§ 182-185. For purposes of simplicity, we refer to it as DCAM.

[16]Pursuant to St. 1980, c. 579, § 55, the burden of making this determination remained with the awarding authority, although the statute permitted an awarding authority to request that DCAM perform such an evaluation on its behalf.

eligibility, which must be renewed annually, are issued only after DCAM's review of the contractor's prior construction experience, professional references, financial condition, and organizational capacity.[17] See G. L. c. 149, § 44D (1)-(3). DCAM may "decertify a contractor or reduce the classes of work and amount of work on which the contractor is eligible to bid," if DCAM learns of a contractor's incompetence, poor performance, or misconduct. See G. L. c. 149, § 44D (5). A contractor who is debarred or whose certification is suspended, revoked, or not renewed by DCAM, loses the ability to contract for construction work from any public authority in the Commonwealth. See G. L. c. 29, § 29F; G. L. c. 149, § 44E.

It was not until 2004, with the enactment of G. L. c. 149, § 44D½, inserted by St. 2004, c. 193, § 19, that awarding authorities were required to prequalify general contractors for individual projects; the statutory requirement, however, applies only to projects estimated to cost at least $10 million.[18] G. L. c. 149, § 44D½ (a). Section 44D½ was one of several amendments proposed by a special commission, see St. 2003, c. 46, § 138, charged with recommending legislation to improve the "adequacy and efficiency" of the public construction laws. While the 1980 and 1984 legislation had standardized the review and monitoring of contractors under the centralized administration of DCAM, many of the 2004 amendments enhanced the flexibility and discretion of municipalities, State agencies, and other governmental authorities in managing their own construction projects.[19] See St. 2004, c. 193, §§ 13, 19, 27.

As a result of the 2004 legislation, a general contractor who

[17]Every bid made to an awarding authority for a contract of general construction must also include an "update statement" reflecting changes in the bidder's financial position or business organization since the date of certification of eligibility. G. L. c. 149, § 44D (1) (a).

[18]For contracts estimated to cost at least $100,000 but not more than $10,000,000, G. L. c. 149, § 44D½ (a), permits, but does not require, an awarding authority to prequalify general contractors. Therefore, an awarding authority issuing a public contract costing less than $10,000,000 is free to rely on DCAM's certification alone as a guarantee of a bidder's capacity and expertise. See id.

[19]The 2004 amendments expanded the range of construction options available to awarding authorities by allowing for the election of "at risk" and "[d]esign build" approaches for projects estimated to cost $5 million or more (G. L. c. 149A, §§ 1, 14), and required awarding authorities to retain an

submits a bid for a project costing at least $10 million has been twice qualified for the work, initially through the DCAM certification procedure, and then again by the prequalification committee's approval of the applicants' specific responses to its RFQ.[20] The prequalification process serves to ensure that parties who may be "responsible and eligible bidders" in a general sense also have the particular skills and experience most relevant to the project at issue. It also requires the awarding authority to invest substantial time and effort, and exercise its sound discretion, in determining the considerations critical to the project and assigning points within the statutory categories accordingly, and then, after submission of the SOQs, in scoring the responses of potential bidders according to the weighted criteria.

The 2004 legislation narrowly limited the grounds for appealing from the committee's prequalification decision: "A general contractor's score shall be made available to the general contractor upon request. The decision of the prequalification committee shall be final and shall not be subject to appeal except on grounds of fraud or collusion." G. L. c. 149, § 44D½ (*h*).[21]

In determining the meaning of "fraud" as it appears in § 44D½ (*h*), we note that the logical implication of the sequence of these two sentences — with the sentence governing an appeal from a decision of the prequalification committee following immediately after the sentence declaring that a general contractor is entitled to learn the score given to its SOQ by the prequalification committee — is that the Legislature anticipated that a general contractor denied prequalification might seek to challenge the committee's scoring of the contractor's SOQ. In such an appeal, "fraud" could not mean an intentional misrepresentation in the SOQ itself, because a general contractor

"owner's project manager" for any project estimated to cost $1.5 million or more to ensure hands-on project oversight (G. L. c. 149, § 44A½ [*a*]). See St. 2004, c. 193, §§ 13, 19, 27.

[20] An awarding authority must select its prequalified bidders before soliciting general bids. By regulation, the deadline for submission of general bids from prequalified general contractors must be at least fourteen days after the awarding authority's issuance of invitations to bid. 810 Code Mass. Regs. § 9.10 (2005).

[21] In 2008, G. L. c. 149, § 44D½ (*h*), was amended to include "arbitrariness" and "capriciousness" as additional grounds for appeal. St. 2008, c. 303, § 23. Because the plaintiffs here allege only fraud, the addition of these grounds for appeal do not affect our analysis.

challenging an unfavorable decision of the committee would not allege that it was entitled to relief because it had intentionally misrepresented material information in its own SOQ. Rather, in the context of a general contractor challenging the denial of its *own* prequalification, "fraud" must mean corrupt conduct *by one or more members of the committee* designed unfairly to prevent the general contractor from being prequalified to bid. Pragmatically, in this context, "fraud" would surely involve "collusion," G. L. c. 149, § 44D½ (*h*), a corrupt agreement between at least one member of the committee and another person, most likely a competing general contractor seeking to fix its competitor's score below the minimum threshold for prequalification to prevent that competitor from bidding. See *Dickerman* v. *Northern Trust Co.*, 176 U.S. 181, 190 (1900); Black's Law Dictionary 300 (9th ed. 2009) (collusion is "[a]n agreement to defraud another or to do or obtain something forbidden by law").[22]

The Legislature, however, did not foreclose an appeal from a decision of a prequalification committee from third parties. Because G. L. c. 149, § 44D½ (*g*), provides that the "register of responders shall be open for public inspection," and, on completion of the evaluations by the prequalification committee, the "contents of the [SOQs] shall be open to the public," we infer that the Legislature also recognized the possibility of an appeal from an allowance of prequalification by a fellow bidder or a member of the general public based, at least in part, on the contents of the SOQ. In this context, "fraud" could still mean corrupt conduct by one or more members of the committee, alone or in collusion with another, but we do not so limit its meaning. We conclude that, consistent with its common-law meaning, "fraud" in this context means a fraudulent misrepresentation by a general contractor applying for prequalification that the committee relied on to its detriment in qualifying the general contractor to bid. In the absence of detrimental reliance by the committee, a general contractor's intentional misrepresentation, even if intended to

---

[22]The inclusion in 2008 of "arbitrariness" and "capriciousness" as additional grounds for appeal allows a disqualified contractor to challenge the denial of his prequalification without needing to make the difficult showing of collusion. St. 2008, c. 303, § 23. Before this amendment, a contractor without direct evidence of collusion had only the argument that collusion should be inferred from the arbitrariness and capriciousness of the committee's decision.

deceive the committee, does not constitute "fraud" within the meaning of G. L. c. 149, § 44D¹/₂ (*h*), and therefore does not require that the committee's prequalification of the contractor be vacated.

We believe that this conclusion is consistent with the comprehensive legislative scheme embodied in the public construction statute for two reasons. First, we do not believe the Legislature, by allowing a prequalification decision to be appealed from on grounds of "fraud," intended to require an awarding authority to disqualify a general contractor or terminate a construction contract because of an intentional misrepresentation in a SOQ where the committee did not act corruptly or in reliance on the misrepresentation and where, in its discretion, the awarding authority does not wish to disqualify the contractor or terminate the contract. Under G. L. c. 149, § 44D (2), "[a]ny materially false statement" made by a general contractor in its application for DCAM certification or its update statement "may, in the discretion of the awarding authority, result in termination of any contract awarded the applicant by the awarding authority." As a result, where an awarding authority learns that a general contractor with whom it has contracted has made an intentional misrepresentation in either of these two filings, the awarding authority may terminate the contract, but is not required to do so. The awarding authority retains this discretion even though a certificate of eligibility from DCAM and an update statement are both mandatory elements of a general contractor's SOQ. G. L. c. 149, § 44D¹/₂ (*e*) (4).[23] Under the interpretation of "fraud" proffered by the plaintiffs and the Attorney General, if an intentional misrepresentation were made in a SOQ or an incorporated update statement rather than an application for DCAM certification, an awarding authority would lose this discretion because a court, as the motion judge did here, could enjoin the awarding authority from continuing with the contract. We see nothing in G. L. c. 149, § 44D¹/₂ (*h*), to suggest that the Legislature intended to deny an awarding authority the discretion it has under G. L. c. 149,

---

[23]Because the application for DCAM certification, the update statement, and the SOQ are so interwoven in the statutory scheme to ensure that bidders are qualified, we understand that the awarding authority would have the same discretion to terminate a construction contract based on a materially false statement in a SOQ.

§ 44D(2), simply because the materially false statement appears in a committee-scored portion of a SOQ rather than in an application for DCAM certification or update statement. In addition, we note that, even where a general contractor's misconduct results in debarment or suspension by DCAM, the Legislature did not require termination of the contractor's existing public construction contracts. Rather, pursuant to G. L. c. 29, § 29F (*h*), a public agency may not "execute, renew, or extend any contract with, a debarred or suspended contractor," but it need not rescind or terminate a contract.[24]

Second, giving the word "fraud" its common-law meaning under § 44D¹/₂ (*h*) does not conflict with the "transparent" legislative intent that the competitive bidding statutes "establish an open and honest procedure for competition for public contracts." *John T. Callahan & Sons* v. *Malden*, 430 Mass. 124, 128 (1999), quoting *Modern Cont. Constr. Co.* v. *Lowell*, 391 Mass. 829, 840 (1984). In formulating the provisions of § 44D¹/₂ in 2004, the Legislature had no need to, and did not, concern itself with remedying intentional misrepresentations that do not infect a prequalification committee's decision-making process because sufficient means to remedy this kind of misconduct — and thereby to ensure the integrity of the public bidding process — were already provided by statute. A general contractor who makes an intentional misrepresentation in a SOQ with the intention of deceiving the prequalification committee risks grave

---

[24]For this reason, we are not persuaded by the plaintiffs' argument that fraud under G. L. c. 149, § 44D¹/₂ (*h*), does not require detrimental reliance because a DCAM regulation provides, "Any General Contractor who fails to respond to the RFQ in accordance with the instructions provided in the RFQ in any material way shall be deemed to be disqualified from consideration for prequalification." 810 Code Mass. Regs. § 9.06(5) (2005). This regulation disqualifies a general contractor from prequalification who has failed to abide by the procedural requirements in the RFQ, such as the deadline for submission, the obligation to sign the SOQ under the pains and penalties of perjury, and the need to include the required commitment letter, performance bonds, and DCAM's certificate of eligibility. *Id.* It cannot reasonably be understood to require an awarding authority to disqualify a general contractor and terminate a contract based on an intentional misrepresentation that the authority did not rely on in its prequalification decision, where the statutes cited above do not require an awarding authority to terminate a contract after debarment, or after learning of an intentional misrepresentation in the contractor's application for DCAM certification or in the update statement submitted with its SOQ. See G. L. c. 29, § 29F (*h*); G. L. c. 149, § 44D (2).

sanctions, regardless of whether the committee acted in reliance on the misrepresentation. The commissioner of DCAM has broad statutory authority to debar a contractor from public contracting based on "substantial evidence" that the contractor has "willfully suppli[ed] materially false information incident to obtaining or attempting to obtain or performing any public contract or subcontract." G. L. c. 29, § 29F (*c*) (2) (i). See G. L. c. 149, § 44C. Under regulations promulgated by the commissioner, wilfully supplying false material information in obtaining or attempting to obtain any public contract or subcontract within the last five years "shall constitute cause for decertification or denial of certification." 810 Code Mass. Regs. § 4.04(8)(e) (2005). The "[f]ailure to provide accurate information" to any party with whom a contractor does business may also be grounds for denial of certification or debarment. 810 Code Mass. Regs. § 4.04(6) (2005). Finally, a contractor making an intentionally false statement in a SOQ risks criminal conviction and its consequent penalties. An applicant must sign the SOQ "under pains and penalties of perjury," G. L. c. 149, § 44D½ (*e*) (ii), so a wilful false statement in the SOQ may subject the applicant to a perjury charge. G. L. c. 268, §§ 1, 1A. Moreover, any person who intentionally makes a material false statement, or omits or conceals a material fact in a written statement, in attempting to procure a construction contract from any department, agency, or municipality of the Commonwealth, may be charged criminally under G. L. c. 266, § 67A.

4. *Conclusion.* In view of our interpretation of the meaning of fraud under G. L. c. 149, § 44D½ (*h*), we conclude that the motion judge committed an error of law in determining that the plaintiffs would not need to prove detrimental reliance by the prequalification committee to prevail on their claim for injunctive relief. As a result of this error, because there is no allegation that any member of the prequalification committee acted corruptly in deciding to prequalify Callahan, and because there is unrefuted evidence that the committee did not act in reliance on any of the alleged misrepresentations, the motion judge abused his discretion in concluding that the plaintiffs were likely to succeed on the merits at trial. Having so found, we need not reach the issue whether a preliminary injunction would promote or adversely affect the public interest, because the

preliminary injunction cannot survive if the plaintiffs are unlikely to succeed on the merits.

We affirm the single justice's order vacating the allowance of the plaintiff's motion for a preliminary injunction.

*So ordered.*