# United States Court of Appeals
## For the First Circuit

---

Nos.  11-2349; 11-2378; 11-2389

ROBERT SMITH,

Plaintiff, Appellee/Cross-Appellant,

MARIA DASILVA,

Plaintiff,

v.

DORCHESTER REAL ESTATE, INC.; NEW ENGLAND MERCHANTS CORP.,

Defendants, Appellants/Cross-Appellees,

DWIGHT JENKINS; LOUIS G. BERTUCCI; ROBERT E. KELLEY; RKELLEY-LAW,
P.C.; EB REAL ESTATE GROUP, INC., d/b/a RE/MAX Real Estate
Specialists; UNION CAPITAL MORTGAGE BUSINESS TRUST; SIGNATURE
GROUP HOLDINGS, INC., f/k/a Fremont Investment &Loan, a/k/a
Fremont Reorganization Corporation,

Defendants, Cross-Appellees,

CHERRY JENKINS; DOREA SMITH; MID CITY MORTGAGE, LLC;
MERITAGE MORTGAGE CORPORATION,

Defendants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before
Howard, Stahl and Thompson,
Circuit Judges.

---

Michael J. Markoff, on brief for New England Merchants Corp.

Thomas K. McCraw, Jr., with whom Jay S. Gregory and LeClairRyan, A Professional Corporation, were on brief, for Dorchester Real Estate, Inc.

James F. McLaughlin, with whom McLaughlin & McLaughlin, P.C. was on brief, for RKelley-Law, P.C. and Robert E. Kelley.

Jeffrey S. Baker, with whom Baker & Associates., P.C., Jonathan D. Plaut, Chardon Law Offices, Patrick M. Groulx and Polis Legal, were on brief, for appellee/cross-appellant.

---

October 15, 2013

---

**HOWARD, Circuit Judge**.  This case arises out of a fraudulent real estate mortgage scheme that involved inducing a schizophrenic trash collector into acting as a straw buyer for two overvalued residential properties in Massachusetts.  That person, Robert Smith, sued various entities and individuals involved in the transactions, including the mortgage lenders, mortgage brokers, real estate brokers, and closing agents.  A jury returned a verdict largely favorable to Smith on his claims of fraud and breach of fiduciary duty, and the district court doubled and trebled certain damages pursuant to the Massachusetts Consumer Protection Statute.  Two of the defendants, real estate brokerage firm Century 21 Dorchester Real Estate, Inc. ("Century 21") and mortgage broker New England Merchants Corporation ("NEMCO") appeal the unfavorable verdict on multiple grounds.  Smith cross-appeals the dismissal of several claims.  We affirm in part and reverse or vacate other rulings.

**I.**

We recite the relevant facts in the light most favorable to the jury verdict.  Incase Inc. v. Timex Corp., 488 F.3d 46, 50 (1st Cir. 2007).

Evidence was introduced from which the jury could have concluded that Smith, who was in his mid-forties during the relevant time period, suffers from schizophrenia, depression, posttraumatic stress disorder, and mild mental retardation.  He is

-3-

functionally illiterate.  In January 2005, a woman who introduced herself as Laurice Taylor approached Smith while he was working as a trash collector for the Waste Management Corporation in Dorchester, Massachusetts.  Taylor told Smith that she worked at a nearby RE/MAX real estate office and invited him to participate in a "special investment program" through RE/MAX.  So long as he had good credit, Smith would receive $10,000 per investment without contributing any capital.  Taylor reassured him that "RE/MAX would take care of everything," and Smith agreed to participate.

Unbeknownst to Smith, the investment opportunity was an illicit scheme developed by Dwight Jenkins, a convicted bank fraudster.  In the words of the district court,

> Jenkins trolled the margins of society for the gullible (like Smith) and the greedy . . . whom he recruited as straw "investors" in shady real estate deals.  With the help of louche mortgage brokers and a complicit attorney, the "investors" were inveigled into taking out "liar loans" for the purchase of overvalued residential properties.  The "investors" received a small fee, while Jenkins and his cohorts (including the brokers) skimmed fees and commissions from the grossly inflated purchase prices.

Smith v. Jenkins, 818 F. Supp. 2d 336, 340 (D. Mass. 2011).  The basics of the scheme may be briefly described.  With the assistance of real estate agents, Jenkins would find a residential property for sale and enter into a purchase and sale agreement with the seller for the listing price.  He would then assign the right to purchase the property to a straw buyer for a significantly higher price.  At the closing, the straw buyer would borrow the amount of

-4-

the higher purchase price, the seller would receive the lower listing price, and Jenkins would take the difference as a "contract release fee." Jenkins characterized this arrangement to the straw buyers as an "investment," promising to maintain the property, collect rent, pay operating bills, mortgages, and other expenses, and eventually sell the property at a profit in which the straw buyer would share.

Smith's evidence on the specifics of the two transactions involved in this litigation follow.

## A. The Dighton Property

After Smith agreed to participate in the purported investment program, he provided his accurate financial information to Taylor. Without his knowledge, Jenkins and Taylor then created a false financial profile for him that grossly overstated his income, assets, and work and renting history. This made him appear, on paper, a more attractive candidate for a mortgage loan. They forwarded the information to Rachel Noyes, a loan originator who worked for mortgage broker NEMCO. Noyes completed a loan application on Smith's behalf (and without his knowledge), falsely indicating that she had gathered the information in a face-to-face interview with Smith, and sent the application to mortgage lender Fremont Investment & Loan. Fremont approved Smith for a "stated income" loan, which did not require income verification.

Shortly thereafter, Taylor instructed Smith to attend a meeting at the law office of RKelley-Law, P.C., to sign documents for an investment. Unbeknownst to Smith, the meeting was a closing on a home in Dighton, Massachusetts. At the closing, Taylor introduced Smith to Jenkins and James Adamos, a real estate agent who worked for Century 21. Adamos handed Smith his business card and said that he was a representative of Century 21. Attorney Louis Bertucci, an associate at RKelley-Law, introduced himself to Smith as the lawyer in charge of the paperwork and assured him that the documents were "in order." Smith did not read any of the documents, including those that he signed, nor did anyone explain to him that he was in fact borrowing $411,964, secured by two mortgages issued by Fremont, to purchase a property. Those present led him to believe that they had his best interests in mind, and he trusted them to handle the "investment" on his behalf. Smith was confident that the investment was legitimate because two well-known companies, RE/MAX and Century 21, were involved in it.

Several days after the Dighton closing, Smith went to RE/MAX's office and there Taylor gave him $10,000. He subsequently signed a document giving Jenkins a power of attorney over the Dighton property. Jenkins received a "contract release fee" of $42,000. NEMCO received a mortgage broker's commission of $8,800. According to the closing documents, no real estate broker received a commission from the sale.

-6-

## B. The Boston Property

Approximately a week later, Taylor contacted Smith again and instructed him to attend a second meeting at RKelley-Law in order to participate in another investment. In the meantime, Jenkins, through Adamos, offered to purchase a residential property in Boston listed through Century 21. Century 21 real estate agent Ivana Foley relayed the offer to the seller, who accepted it. As on the previous occasion, the plan was for Jenkins to assign the purchase and sale agreement to Smith for a price substantially higher than the listing price and collect the difference.

This time Philip Goodwin, a loan originator who worked for Union Capital Mortgage Business Trust ("Union Capital") filled out a loan application on Smith's behalf (without meeting Smith) and forwarded it to Meritage Mortgage Corporation ("Meritage"). Like the application for the Dighton property, this application also misrepresented Smith's income, assets, and other pertinent information. The application did not mention that Smith owned or had a mortgage on the Dighton property. Meritage approved the loan.

As on the previous occasion, Smith met Taylor and Bertucci at the RKelley-Law office on the day of the closing. Foley was also present. She introduced herself to Smith, gave him her business card, and assured him that everything would be "all right." Taylor, Bertucci, and Foley led Smith to believe that he

was making another good investment, and he trusted them. Bertucci placed a stack of papers in front of Smith for his signature without explaining their contents. Smith again signed the documents without reading them, unwittingly borrowing $437,198.13 for the purchase of the Boston property, secured by two mortgages from Meritage.

Several days after the second closing, Taylor gave Smith $9,000 as his share. Jenkins received a "contract release fee" of $41,500, and Century 21 received a broker's commission of $18,950. Both Foley and Adamos received a share of Century 21's commission, Foley as the listing agent and Adamos as the selling agent.

A number of months after the closings, Smith began receiving calls from the lenders on a daily basis regarding missed mortgage payments. Taylor at first assured him that this was no cause for concern, while Jenkins avoided his calls. The two properties were eventually foreclosed on. In the meantime, Smith's mental health deteriorated. The severity of the voices in his head worsened. He became suicidal and withdrew from the company of those close to him. Because his credit was ruined, he was unable to rent an apartment or obtain new credit cards.

## C. Court Proceedings

Smith filed a complaint in Massachusetts state court against the various entities and individuals involved in the scheme. He alleged a host of state claims, including fraud, breach

of fiduciary duty, and violation of the Massachusetts Consumer Protection Statute, see Mass. Gen. Laws ch. 93A, and two federal claims for violations of the Truth in Lending Act ("TILA"), see 15 U.S.C. § 1635(e), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), see 18 U.S.C. §§ 1961-1969. The defendants removed the case to the federal court.

The district court dismissed a number of claims and disposed of others, including the two federal claims, through summary judgment.[1] The surviving claims of fraud (against RE/MAX, Century 21, NEMCO, Union Capital, Bertucci, and Jenkins) and breach of fiduciary duty (against RE/MAX, Century 21, NEMCO, and Union Capital) were tried before a jury.[2] The court reserved ruling on the Chapter 93A claim until after trial. The jury found for Smith except as against RE/MAX and awarded damages totaling $260,000, apportioned among the remaining defendants.

Century 21, NEMCO, and Union Capital moved for judgment as a matter of law or, in the alternative, for a new trial. The court denied the motions of Century 21 and NEMCO but granted Union Capital's motion on sufficiency-of-the-evidence grounds.

---

[1] Although no federal claim remained to be tried, the court retained supplemental jurisdiction over the state claims. See Rodriquez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) ("In an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims.").

[2] Smith's breach of contract claims against Jenkins and RE/MAX were also before the jury. Neither is pertinent to this appeal.

The court then issued a split decision on Smith's Chapter 93A claim. It dismissed the claim against Century 21 and Union Capital, ruling that Smith had failed to comply with the demand letter requirement, see Mass. Gen. Laws ch. 93A, § 9(3). Finding that Jenkins, Bertucci, and NEMCO had violated the act, the court awarded Smith treble damages against Jenkins and Bertucci, double damages against NEMCO, and attorneys' fees.

Century 21 and NEMCO timely appealed, and Smith cross-appealed the dismissal of several claims.

**II.**

**A.  Century 21**

The jury found Century 21 liable to Smith for fraud and breach of fiduciary duty and awarded $50,000 in damages for those claims. The district court denied Century 21's post-trial motions challenging the verdict on sufficiency-of-the-evidence grounds and assigning error to the court's decision to allow Smith's damages expert to testify at trial.

1.  Sufficiency of the Evidence

We review de novo a district court's denial of a motion for judgment as a matter of law. Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006). "Our review is weighted toward preservation of the jury verdict because a verdict should be set aside only if the jury failed to reach the only result permitted by

the evidence." Id. (internal quotation marks omitted).  In this case, sufficient evidence supported the verdict against Century 21.

Under Massachusetts law, "fraud is a knowing false representation of a material fact intended to induce a plaintiff to act in reliance, where the plaintiff did, in fact, rely on the misrepresentation to his detriment."  Fordyce v. Town of Hanover, 929 N.E.2d 929, 936 (Mass. 2010).  Century 21 argues that Smith failed to prove that Century 21 made a misrepresentation with the intent of inducing his reliance, or that he in fact relied on any statements that were made.  Century 21 also argues that there was no evidence that Adamos, its "independent contractor" who operated several other ventures during the period of his affiliation with Century 21, acted with its actual or apparent authority.  The record contradicts both positions.

Smith testified that Adamos, who was present at the Dighton closing, and Foley, who was at the Boston closing, introduced themselves as Century 21 agents, that they misrepresented the closings as investment deals that they and their cohorts would manage on Smith's behalf, and that he relied on those representations when he unwittingly purchased the two properties with borrowed funds.  As the district court correctly discerned, the jury could have attributed Adamos's misrepresentations to Century 21 because he worked as a sales agent for Century 21 at the time and represented himself as an agent of Century 21.  Moreover,

-11-

despite being aware that Adamos was working with Jenkins in various capacities, the owner of the Century 21 office Karin Cahill did nothing to correct the impression that Adamos was acting on behalf of the agency.

Given Adamos's involvement and representations, the mere fact that there was no evidence that Century 21 received a commission from the sale of the Dighton property does not preclude a finding that Adamos was acting on Century 21's behalf. The jury could have reasonably inferred that Century 21 was nonetheless "in" on the deal, especially given the commission that it received two weeks later from the sale of the Boston property. Indeed, Adamos received a portion of that commission, as it was through him that Jenkins offered to purchase the property. Moreover, it is undisputed that Foley was at the Boston closing on behalf of Century 21 and that she also assured Smith that the investment was sound. There was sufficient evidence to support the jury verdict against Century 21 on the fraud claim.

Century 21 also challenges the sufficiency of the evidence to support its liability for breach of fiduciary duty. Smith alleged that a fiduciary relationship between him and Century 21 arose from the nature of their interactions. See Doe v. Harbor Sch., Inc., 843 N.E.2d 1058, 1064 (Mass. 2006) (distinguishing between a fiduciary relationship created by law and one that arises from the parties' conduct). Under Massachusetts law, "trust and

-12-

confidence reposed in a party possessing a great disparity of knowledge or expertise . . . , while ordinarily not enough standing alone to give rise to fiduciary obligations, may produce such obligations if the trust and confidence is knowingly betrayed by that party for the purpose of securing some benefit to itself." Geo. Knight & Co. v. Watson Wyatt & Co., 170 F.3d 210, 216 (1st Cir. 1999); see Broomfield v. Kosow, 212 N.E.2d 556, 560 (Mass. 1965). In determining whether a business relationship is fiduciary in nature, "courts look to the defendant's knowledge of the plaintiff's reliance and consider the relation of the parties, the plaintiff's business capacity contrasted with that of the defendant, and the 'readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge.'" Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995) (quoting Broomfield, 212 N.E.2d at 560).

In this case, the evidence was sufficient to support the jury finding that Smith had a relationship of trust and confidence with Century 21 and that Century 21 abused his trust. The circumstances of the case are truly exceptional. First, the parties had vastly disproportionate knowledge of the scheme. Unlike Century 21, whose agents were experienced in real estate transactions and understood the obligations that Smith was undertaking, Smith did not even know that he was purchasing two

properties, let alone that he was obligating himself to repay nearly $850,000. Indeed, Century 21 agents and their cohorts kept Smith entirely blind as to the nature of the purported investments. Second, Smith signed the documents because he trusted those who were present at the closings, including Century 21 agents, when they repeatedly assured him that they would "take care of everything." Smith testified that they convinced him that the investments were legitimate, that the information on the documents he was asked to sign was correct, and that he need not worry because they would handle the investments on his behalf. In short, they told him to trust them and so he did. He readily followed their guidance by signing where indicated without question, even though no one explained the documents to him.[3] Finally, Century 21 exploited the disparity in the relationship and betrayed Smith's trust to secure a benefit for itself, raking in commissions from at least one of the fraudulent transactions and leaving Smith to deal with the consequences of the inevitable defaults. Accordingly, there was sufficient evidence for the jury to find Century 21 liable for breach of fiduciary duty.

---

[3] That those present at the closings knew that Smith had reposed his trust in them also finds support in the considerable evidence that Smith suffered from many vulnerabilities (including mental illness and functional illiteracy) that would have been apparent to those who interacted with him. Indeed, the jury could have found that Smith became the victim of the scheme precisely because it was apparent that he would repose trust in the defendants.

## 2. Admission of Expert Testimony on Damages

Century 21 also challenges the district court's denial of its pre-trial motion to preclude the testimony of Smith's damages expert, forensic economist Stan V. Smith, Ph.D., and the subsequent denial of its motion to strike Dr. Smith's testimony. We agree that portions of Dr. Smith's testimony should have been precluded.

Federal Rule of Evidence 702 assigns to the district court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). To determine whether an expert's testimony is sufficiently reliable, the district court considers whether "the testimony is based on sufficient facts or data"; whether "the testimony is the product of reliable principles and methods"; and whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; see Daubert, 509 U.S. 592-94. As to the relevancy criterion, the court must determine whether the testimony "will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592.

"[T]here is no particular procedure that the trial court is required to follow in executing its gatekeeping function under Daubert." United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002). However, the gatekeeper function must be performed. Id. (citing Daubert, 509 U.S. at 592); see also Kumho Tire Co. v. Carmichael,

526 U.S. 137, 158-59 (Scalia, J., concurring) (observing that "trial court discretion in choosing the manner of testing expert reliability is not discretion to abandon the gatekeeping function"). Although the court need not make explicit findings on the admissibility criteria sua sponte, Hoult v. Hoult, 57 F.3d 1, 5 (1st Cir. 1995), "[w]ithout specific findings or discussion on the record, it is impossible on appeal to determine whether the district court carefully and meticulously reviewed the proffered . . . evidence or simply made an off-the-cuff decision to admit the expert testimony." Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000) (internal quotation marks omitted) (brackets omitted) (emphasis added).

The question of whether the district court actually performed its gatekeeping function in the first place is subject to de novo review. United States v. Avitia-Guillen, 680 F.3d 1254, 1256 (10th Cir.), cert. denied, 133 S. Ct. 466 (2012); Naeem v. McKesson Drug Co., 444 F.3d 593, 607 (7th Cir. 2006). If we are satisfied that the court did not altogether abdicate its role under Daubert, we review for abuse of discretion its decision to admit or exclude expert testimony. Kumho, 526 U.S. at 152; Crowe v. Marchand, 506 F.3d 13, 16 (1st Cir. 2007). If we determine that the court abused its discretion, we then must determine whether the error was harmless. Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 62 (1st Cir. 2011).

From the evidence in the record, we are unable to conclude that the district court sufficiently evaluated the admissibility of Dr. Smith's testimony. There are no statements on the record indicating that the court conducted a <u>Daubert</u> analysis. The judge denied without comment the defendants' motion to preclude Dr. Smith's testimony as unreliable and unhelpful to the jury. In denying the motion to strike the trial testimony on the same grounds, the court stated only that "[a]ny infirmities in the witness's testimony were exposed during cross-examination. Whether these undermine the creditability of the witness's ultimate opinion(s) are for the jury to determine." But a court cannot rely on the jury to determine the relevance and reliability of the proffered testimony in the first instance; <u>Daubert</u> and its progeny place this responsibility in the hands of the district court.

We, of course, are not suggesting that the experienced trial judge ignored <u>Daubert</u>. Still, given the record-based limitations under which we are required to operate, the absence of any findings or discussion on the record leaves us hard-pressed to conclude that the district court adequately fulfilled its gatekeeping role in admitting Dr. Smith's testimony.

Alternatively, however, even if the district court conducted a <u>sub</u> <u>silentio</u> review, the admission of much of Dr. Smith's testimony cannot be upheld as an exercise of the district court's discretion. Dr. Smith testified that the plaintiff

suffered three types of damages:  (1) the loss of enjoyment of life (so-called "hedonic damages");(2) the loss of credit expectancy as a result of two foreclosures on his record; and (3) the loss of time expended dealing with the consequences of the fraud scheme. We find that the first two categories fell short of admissibility in any event and leave the third to the district court to consider on remand after performing a <u>Daubert</u> analysis.

### a.  Hedonic Damages

We begin with the contentious issue of hedonic damages. Dr. Smith opined that Smith is entitled to $219,900 for his loss of enjoyment of life.  To arrive at that figure, Dr. Smith employed a method for valuing life known as the "willingness-to-pay" model. This model measures the monetary worth of life by calculating the amounts that individuals, government agencies, and businesses are willing to pay for reductions in health and safety risks.  The model relies on labor market studies reflecting wage risk premiums, studies reflecting consumer purchases of safety equipment, questionnaires regarding consumers' willingness to pay for safety measures,  and  studies  of  government  regulations  requiring expenditures for certain safety devices.  Dr. Smith testified that the resulting figure is between $5 and $6 million for the value of a "statistically average" person's life, defined as a 31-year-old with a 45-year additional life expectancy.

To be "conservative," Dr. Smith instead used $4.2 million as the value of life in calculating Smith's damages, without offering any rationale for the chosen figure. This figure, according to Dr. Smith, averages out to approximately $130,000 as the monetary worth of one year of life. Next, Dr. Smith took into account that Smith had reported losing 90% of his enjoyment of life as a consequence of the defendants' conduct. But instead of using that percentage, at the behest of Smith's counsel Dr. Smith used "arbitrarily conservative" figures of 25% loss of enjoyment in the early years and 12.5% loss in the later years. Multiplying these percentages by the per-year value of life yielded the $219,900 figure for Smith's hedonic damages.

Before considering whether Dr. Smith's testimony was admissible under Daubert, we delineate the limits of our review. Century 21 only argues that Dr. Smith's opinion about Smith's hedonic damages failed to satisfy the requirements of Rule 702. It makes no argument that hedonic damages are not recoverable at all in this type of suit, and therefore we do not decide that issue.[4]

---

[4] We note, however, that it is not clear whether Smith is entitled to hedonic damages under the circumstances of this case. In re Griffith, 800 N.E. 2d 259 (Mass. 2003) discusses hedonic damages, although we have found no Massachusetts case addressing the scope of such damages. A number of decisions in other jurisdictions indicate that hedonic damages are recoverable, if at all, only for permanent injuries. See Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 771-72 n.62 (Tex. 2003) (collecting cases).

Assuming that hedonic damages are compensable in this case, Dr. Smith's testimony nonetheless should have been excluded under Rule 702. Dr. Smith has been the subject of numerous decisions regarding the admissibility of his expert opinions on this very issue. The overwhelming majority of courts have concluded that his "willingness-to-pay" methodology is either unreliable or not likely to assist the jury in valuing hedonic damages, or both. See, e.g., Allen v. Bank of Am., N.A., CIV. CCB-11-33, 2013 WL 1164898, at *12 (D. Md. Mar. 19, 2013); Richman v. Burgeson, No. 98 C 7350, 2008 WL 2567132, at *2-*4 (N.D. Ill. June 24, 2008); Davis v. ROCOR Int'l, 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002); Saia v. Sears Roebuck & Co., 47 F. Supp. 2d 141, 148-50 (D. Mass. 1999); Brereton v. United States, 973 F. Supp. 752, 758 (E.D. Mich. 1997); Kurncz v. Honda N. Am., Inc., 166 F.R.D. 386, 388-90 (W.D. Mich. 1996); Ayers v. Robinson, 887 F. Supp. 1049, 1059-64 (N.D. Ill. 1995); Sullivan v. U.S. Gypsum Co., 862 F. Supp. 317, 321 (D. Kan. 1994); Mercado v. Ahmed, 756 F. Supp. 1097, 1103 (N.D. Ill. 1991), aff'd, 974 F.2d 863, 868-71 (7th Cir. 1992); see also Dorn v. Burlington N. Santa Fe R.R. Co., 397 F.3d 1183, 1195 n.5 (9th Cir. 2005) (collecting state cases where Dr. Smith's testimony was excluded). But see Sherrod v. Berry, 629 F. Supp. 159, 162-64 (N.D. Ill. 1985), aff'd, 827 F.2d 195, 205-06 (7th Cir. 1987), vacated and remanded on other grounds, 856 F.2d 802 (7th Cir. 1988). Indeed, "[t]roubled by the disparity of

results reached in published value-of-life studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of Daubert have unanimously held quantifications of such damages inadmissable." Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1245 (10th Cir. 2000).

We share the concerns of those courts that have excluded expert testimony based on the "willingness-to-pay" methodology as lacking in reliability. Like the Seventh Circuit, we have serious doubts that the underlying studies actually measure the value of life. Mercado, 974 F.2d at 871. In terms of consumer purchases,

> spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items reflects a consumer's willingness to pay to reduce risk, perhaps more a measure of how cautious a person is than how much he or she values life. Few of us, when confronted with the threat, "Your money or your life!" would, like Jack Benny, pause and respond, "I'm thinking, I'm thinking." Most of us would empty our wallets.

Id. And as for the wage-risk premiums that Dr. Smith purportedly took into account, "[t]o say that the salary paid to those who hold risky jobs tells us something significant about how much we value life ignores the fact that humans are moved by more than monetary incentives." Id.; see Wilt v. Buracker, 443 S.E.2d 196, 205 (W.

-21-

Va. 1993) ("Anyone who is familiar with the wages of coal miners, policemen, and firefighters would scoff at the assertion that these high risk jobs have any meaningful extra wage component for the risks undertaken by workers in those professions."). Finally, the cost of government health and safety regulations per life saved "may suggest a collective policy judgment the government has made, or may represent a policy selected for reasons other than the cost-benefit analysis 'hedonic analysis' implies, or even a mistaken policy." Dorn, 397 F.3d at 1195; see Mercado, 974 F.2d at 871 (identifying a host of issues other than the value of life that prompt government health and safety measures). In short, Dr. Smith's method for valuing life is based on assumptions "that appear to controvert logic and good sense." Wilt, 443 S.E.2d at 205.

But even assuming that Dr. Smith's formula is a reliable measure of the value of life, it was of no assistance to the jury in calculating Smith's loss of enjoyment of life. As other courts have recognized, "[t]he willingness-to-pay studies do not relate in any way to the actual component of damages, the enjoyment of life." Id. at 205 n.15; see Sullivan, 862 F. Supp. at 321 ("The studies relied on by Mr. Smith do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data for calculating damages for . . . loss of enjoyment of life."). Dr. Smith equated

-22-

the value of life with the value of enjoyment of life, though it is readily apparent that the two are not the same. A plaintiff who loses enjoyment of life but is alive is not in the same shoes as a plaintiff who lost his life. As the court observed in <u>Sullivan</u>: "Mr. and Mrs. Sullivan suffered totally distinct and different damages (Mrs. Sullivan died, Mr. Sullivan faces living without the support and companionship of his wife), yet, under Mr. Smith's analysis their damages are identical, save only an adjustment for differing the expectancy." 862 F. Supp. at 321. That Dr. Smith may equate the value of enjoyment of life with the value of life itself is not enough to bridge the gap. <u>See</u> <u>Gen. Elec. Co.</u> v. <u>Joiner</u>, 522 U.S. 136, 146 (1997) ("[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert.").

### b.  Loss of Credit Expectancy

Dr. Smith also testified that Smith suffered "the loss of credit expectancy" in the amount of $87,850 as a result of the foreclosures. According to Dr. Smith, a person with a good credit rating has the ability to borrow twice his annual income at a 12% rate of interest. This "credit expectancy" represents a "safety net"--even though a person will "rarely" have to borrow the maximum available credit, it is valuable, according to Dr. Smith, because it gives the person "flexibility, an option in life." On the other

hand, someone with a bad credit rating has an increased cost of using this available credit because the rate of interest jumps to at least 25%. The increased cost lasts for seven years, the length of time that a delinquency remains on a credit report. According to Dr. Smith, this increased cost of borrowing twice one's income is the amount of lost credit expectancy. Because Smith had a good credit rating prior to the foreclosures, which derailed it, Dr. Smith doubled Smith's reported income of $41,000 and multiplied it by 13% per year for seven years to arrive at the $87,850 figure for Smith's loss of credit expectancy.

This testimony was inadmissible under Rule 702. By the time this case went to trial, more than five years had passed since Smith's credit troubles began. Even assuming that Smith actually had the capacity to borrow twice his income at the suggested rates, a proposition for which Dr. Smith cited no authority but himself, there was no evidence that Smith tried to or had the intention to borrow anything close to that amount during those five years.[5] The conclusion that Smith should nonetheless be compensated as if he had borrowed the maximum amount of "available" credit in year one at the high cost of 25% per year is unsupportable. The disconnect between Dr. Smith's methodology and the facts of the case rendered

_____

[5] Smith only testified that he "applied for credit cards, and they wouldn't give it to me."

the testimony unhelpful to the jury in determining Smith's actual damages.

Similarly, there was no evidence of the likelihood of Smith borrowing the stated sum in the remaining two years before the foreclosures would disappear from his credit report. Nor was there any evidence of his income at the time, a crucial variable in Dr. Smith's formula. "With respect to future damages, a plaintiff is entitled to compensation for all damages that reasonably are to be expected to follow, but not to those that possibly may follow, the injury which he has suffered." Donovan v. Philip Morris USA, Inc., 914 N.E.2d 891, 899 (Mass. 2009) (internal quotation marks omitted) (brackets omitted). Absent evidence to the contrary, Smith's loss of future credit expectancy at the rate calculated by Dr. Smith was merely in the realm of possible harm. As such, it was speculative and should have been excluded.

None of this is to suggest that the damage to Smith's credit rating is not compensable. See United States v. Burke, 504 U.S. 229, 239 (1992) (listing "a ruined credit rating" as an example of consequential damages). Dr. Smith's methodology was simply not a useful measure, and his testimony should not have been admitted.

c. Loss of Time

Finally, Dr. Smith testified that Smith was entitled to $22,729 for the time that he spent dealing with the consequences of

the fraud. According to Dr. Smith, Smith spent at least half an hour a day for five years seeking to resolve foreclosure-related issues. Dr. Smith valued that time by calculating how much Smith would have expended had he hired an administrative assistant to handle those issues on his behalf.

Century 21 maintains that Dr. Smith's testimony lacked a factual foundation because there was no evidence that Smith was ever employed as an administrative assistant or that he spent half an hour per day dealing with the consequences of the foreclosures. We leave this issue for the district court to properly assess under Daubert.

### d. Harmlessness Analysis

Finally, again assuming in the alternative that the district court performed the Daubert assessment and that the admission of a portion of Dr. Smith's testimony was nevertheless erroneous, we find that the error was not harmless. Indeed, the district court apparently thought so as well. In denying Century 21's post-trial motion, the court candidly observed that "Dr. Smith's testimony was hardly a model of exactitude, and in retrospect, it perhaps should have been excluded." Smith v. Jenkins, 07-CV-12067-RGS, 2011 WL 1660577, at *2 (D. Mass. May 3, 2011). But, according to the district court,

> it is equally true that from every appearance, the jury did not base its damages award on those portions of Dr. Smith's relatively brief testimony that veered from the mundane into the purely speculative . . . . It appears

-26-

> rather that the jury based its far less ambitious awards against those defendants it found liable on a common-sense assessment of the impact that the ruin of Smith's credit had (and will have) on his emotional health and future earning prospects.

Id.

It appears to us, however, that the court's jury instruction on damages must have affected the jury's determination. The jury was told that Smith was presenting "a unified theory of damages, as explained in the testimony of his economist, Dr. Smith" and that any award of damages "should be guided by one or more of the measures put forward by Dr. Smith." As it is "[a] basic premise of our jury system . . . that the jury follows the court's instructions," we presume that the jury acted according to its charge. Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37, 40 (1st Cir. 1991). Indeed, while the $260,000 that was awarded by the jury was lower than Dr. Smith's $330,000 estimate, we can discern no basis in the record other than Dr. Smith's testimony for an award that was 79% of the amount that he estimated. Given the instruction and the damages awarded, we cannot say with any degree of assurance that the award was not substantially swayed by the erroneous admission of Dr. Smith's testimony. Accordingly, we remand for a new trial on damages.[6]

---

[6] Because we are ordering a new trial on damages, we need not reach Smith's claim that the district court erred by failing to instruct the jury that, in addition to the measures of damages testified to by Dr. Smith, Smith could be compensated for: (1) Jenkins's "contract release fees"; (2) the rents from the two

## B.   NEMCO

The jury found NEMCO, the mortgage broker for the Dighton transaction, liable to Smith for fraud and breach of fiduciary duty.  The district court denied NEMCO's motion for judgment as a matter of law and doubled the jury's $50,000 award against NEMCO pursuant to Chapter 93A.  NEMCO appeals both the denial of the motion and the Chapter 93A ruling.

### 1.  Common-Law Claims

NEMCO argues that no evidence was offered at trial that a representative of NEMCO made any statements to Smith upon which Smith could have reasonably relied, thus precluding liability on the fraud claim. See Fordyce, 929 N.E.2d at 936.  Similarly, NEMCO maintains that there was no evidence that Smith had reposed a high degree of trust and confidence in NEMCO or that NEMCO was aware of his trust. See Broomfield, 212 N.E.2d at 560.  A careful review of the record persuades us that NEMCO is right.

The record before the jury was devoid of any evidence that NEMCO made any statement to Smith, let alone one that he relied upon to his detriment.  Smith had no communication with Noyes, NEMCO's loan originator who filled out Smith's loan application for the Dighton property, or any other person

---

properties collected prior to the foreclosures; and (3) Smith's potential tax liability based on the forgiveness-of-indebtedness income from the foreclosures.

associated with NEMCO. Smith makes much of the fact that he signed the loan application at the closing, but the misrepresentations in that application were statements made to the lender, not to Smith. And even if the application could be construed as a statement to Smith, Smith testified that he never read it or understood its import, and therefore he could not have relied upon it.

To salvage the claim, Smith argues that Bertucci, as the closing attorney, spoke on behalf of NEMCO when he assured Smith that the paperwork was in order. There is no evidence in the record to support this assertion. Bertucci's uncontroverted testimony was that he was the attorney for the lender, Fremont.

Undeterred by the lack of evidence, Smith argues that NEMCO must have authorized Fremont to appoint Bertucci as NEMCO's agent because, as the mortgage broker, NEMCO was required to maintain all records of the transaction and to make disclosures to Smith. Smith cites no authority for this proposition. An attorney's services as a closing agent are typically relied upon by all the parties to a real estate transaction. That, in itself, is insufficient to make the closing agent a representative of the mortgage broker or anyone else but the lender. Because there was no evidence that any agent of NEMCO made any statement to Smith

that he relied upon to his detriment, the jury verdict against NEMCO on the fraud count cannot stand.[7]

The same is true for the breach of fiduciary duty claim. Because Smith was unaware of NEMCO's role in the scheme, he could not have reposed his trust in the mortgage broker. There is no evidence, moreover, that NEMCO was aware of Smith's trust such that a fiduciary duty could attach. Accordingly, NEMCO is entitled to judgment as a matter of law on this claim as well.[8]

## 2. Chapter 93A Claim

After the jury returned its verdict, the district court held that NEMCO had violated Chapter 93A by engaging in deceptive conduct and that punitive damages were warranted. NEMCO argues that the court made clear factual errors and that the evidence did not support a finding of liability. We agree.

Chapter 93A provides a cause of action for a plaintiff who "has been injured," Mass. Gen. Laws ch. 93A, § 9(1), by "unfair or deceptive acts or practices," id. ch. 93A, § 2(a). "The

---

[7] Smith argues that because Jenkins refused to testify at trial on the basis of the Fifth Amendment, the jury could conclude that Jenkins was also an agent of NEMCO. As this assertion amounts to nothing more than speculation, we do not indulge it.

[8] For the same reasons, we affirm the grant of Union Capital's motion for judgment as a matter of law, which Smith challenges in his cross-appeal. The exact same evidentiary deficiencies existed in Smith's claims against Union Capital, the mortgage broker for the Boston transaction. Curiously, the district court correctly set aside the jury verdict against Union Capital, but did not apply the same rationale to the verdict against NEMCO.

determination of whether certain conduct is unfair or deceptive is a question of fact, but whether that conduct rises to the level of a chapter 93A violation is a question of law." <u>Fed. Ins. Co.</u> v. <u>HPSC, Inc.</u>, 480 F.3d 26, 34 (1st Cir. 2007). We review the district court's findings of fact for clear error and its conclusions of law de novo. <u>Arthur D. Little, Inc.</u> v. <u>Dooyang Corp.</u>, 147 F.3d 47, 54 (1st Cir. 1998). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>United States</u> v. <u>U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948).

The district court ruled that NEMCO had violated Chapter 93A by engaging in deceptive conduct. Specifically, the court found that "Noyes, the NEMC[O] branch manager with whom Jenkins and Taylor were in league, made numerous statements that she knew or should have known were false regarding Smith's creditworthiness in the loan applications for both properties." <u>Smith</u>, 818 F. Supp. 2d at 342. The court compared the two applications and concluded that they contained numerous "glaring inconsistencies" that "could not have gone unnoticed" by Noyes. <u>Id.</u> at 343. In addition, the court found that in both applications Noyes falsely stated that she had gathered the information in a face-to-face interview with Smith. <u>Id.</u> at 342-43. Based on these findings, the court concluded that

Noyes's conduct constituted a willing and knowing violation of Chapter 93A and doubled the jury award against NEMCO.

The key finding -- that Noyes had completed both loan applications -- was clearly erroneous. The evidence showed that Noyes was the loan originator only for the Dighton transaction. It was undisputed that Union Capital was the mortgage broker for the Boston transaction and that its employee Goodwin completed the second loan application. There was no evidence that Noyes was involved in the Boston transaction in any capacity or that NEMCO and Union Capital were somehow related. Hence, the inconsistencies in the two applications amount to naught.

Nor was there any evidence that Noyes was "in league" with Jenkins and Taylor. There was no evidence of any communication between Noyes and Jenkins, or between Noyes and Taylor.[9] Without more, the record does not support the finding that Noyes knew or should have known that Smith's financial information was false.[10]

All that is left, then, is Noyes's representation in the application that she had interviewed Smith in person in preparing

---

[9] Neither Noyes nor Taylor was called to testify at trial, and Jenkins asserted his Fifth Amendment privilege.

[10] We cannot independently conclude that Smith's purported income of $90,000, as stated in the loan application, was so disproportionate to his stated occupation as a driver for Waste Management that, based on that alone, Noyes must have known the information was false.

the loan application for the Dighton property.  As Smith testified that he never met Noyes, the district court supportably found that Noyes knew that this statement was false.  But when the alleged basis for Chapter 93A liability is a misrepresentation, as is the case here, a plaintiff must prove "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception."  Casavant v. Norwegian Cruise Line Ltd., 952 N.E.2d 908, 912 (Mass. 2011) (internal quotation marks omitted); see also Hershenow v. Enter. Rent-A-Car Co. of Bos., Inc., 840 N.E.2d 526, 528 (Mass. 2006) ("[P]roving a causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery under our consumer protection statute.").  Smith speculates that by misrepresenting how she acquired his information, Noyes was able to "lend false legitimacy" to the loan application.  As NEMCO points out, however, there was no evidence as to the effect of the statement on the lender's decision to make the loan.  The lender's representative testified that Smith's "creditworthiness, his ability to repay, his proven track record of making payments . . . to other creditors . . . and his employment" were behind the decision to make the loan.

On this record -- a clearly erroneous finding that Noyes had prepared the loan application for the Boston transaction, and a lack of evidence of the effect of Noyes's actions on the Dighton transaction -- we must vacate the judgment against NEMCO on the

Chapter 93A claim and remand this issue to the district court.

Although the district court has discretion over any further

proceedings, we note that an evidentiary hearing would allow both

NEMCO and Smith to develop their positions and could help avoid

confusion about the facts of the case in any future appeal.[11]

**C. Smith's Cross-Appeal**

In his cross-appeal, Smith assigns error to various

rulings of the district court.  We address them in turn.

<u>1.  Judgment in favor of Kelley and RKelley-Law</u>

At the close of Smith's evidence, RKelley-Law and Robert

Kelley, its sole shareholder, moved for judgment as a matter of law

on all counts.  The district court granted the motion on the basis

that there was no evidence that Kelley knew about or participated

in the fraud.  Smith maintains that there was sufficient evidence

of Kelley's direct involvement to allow the question to go to the

jury, and that, in any event, Kelley and the law firm could be held

vicariously liable for Bertucci's fraud.

The first argument need not detain us.  According to

Smith, the evidence of Kelley's direct involvement is his signature

---

[11] We do not reach NEMCO's appellate arguments that the
district court erred when it denied its motion in limine to exclude
a cease-and-desist order and when it declined to give a curative
instruction in response to a portion of plaintiff's counsel's
closing argument.  With respect to the cease-and-desist order, in
any retrial the district court will need to consider whether the
order is inadmissible as evidence of propensity, <u>see</u> Fed. R. Evid.
404(b), or properly may be admitted for another purpose.

on several closing documents that also bear Smith's signature. Smith argues that, based on this alone, the jury could conclude that Kelley had communicated with Smith at the closing and made the same false assurances as Bertucci. Smith conveniently fails to mention his testimony that he did not meet Kelley at either closing and that Bertucci was the only lawyer present who made representations to Smith about the documents that Smith was asked to sign. In this case, Kelley's signature on a couple of forms is simply not enough to show that Kelley made false statements to Smith upon which Smith relied to his detriment. The district court correctly entered judgment in Kelley's favor.

We think, however, that the court was mistaken in granting the motion of RKelley-Law, the professional corporation that employed Bertucci. Sufficient evidence was presented to warrant a finding that the firm was vicariously liable for Bertucci's fraud. Under Massachusetts law, an employer may be held vicariously liable for an intentional tort committed by an agent or employee within the scope of the employment. Worcester Ins. Co. v. Fells Acres Day Sch., Inc., 558 N.E.2d 958, 967 (Mass. 1990). "[C]onduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer."

<u>Wang Labs., Inc.</u> v. <u>Bus. Incentives, Inc.</u>, 501 N.E.2d 1163, 1166 (Mass. 1986) (internal citations omitted).

The evidence would have permitted a jury to find that all three elements were satisfied:  that Bertucci's acts as the closing agent were within the purview of his job, that both closings took place at the RKelley-Law office during regular business hours, and that Bertucci's participation in the fraudulent closings was motivated, at least in part, by a desire to serve RKelley-Law's interests (the firm received fees as the closing agent on both transactions).  Because the jury found Bertucci liable for fraud, and because there was evidence that Bertucci acted within the scope of his employment, we vacate the entry of judgment in favor of RKelley-Law and remand this issue to the district court.  On remand, RKelley-Law may present a defense to Smith's claims of vicarious liability for both Bertucci's fraud and his violation of Chapter 93A.  <u>See</u> <u>id.</u> (holding that employer is liable under Chapter 93A for employee's conduct that falls within the scope of the employment).[12]

---

[12] Smith argues, in a footnote, that Kelley is also vicariously liable for Bertucci's conduct because, although RKelley-Law is a professional corporation, the Massachusetts Professional Corporation Law provides that it does not "alter any law applicable to the relationship between a person rendering professional services and a person receiving such services, including liability arising out of such professional services."  Mass. Gen. Laws ch. 156A, § 6(b).  Given that Smith does not challenge the district court's determination that there was no attorney-client relationship between him and Bertucci, the applicability of the cited provision is unclear.  As Smith has failed to develop the

## 2.  Chapter 93A Demand Letters

Union Capital and Century 21 moved for judgment as a matter of law on Smith's Chapter 93A claims.  The district court granted the motions, ruling that Smith had failed to properly serve either defendant with a demand letter as required by the statute.  Smith argues that he complied with the statutory requirement and that the court erroneously required that the letters be served on the defendants in compliance with the Massachusetts service of process rules.  We review the grant of the motions de novo, taking the facts in the light most favorable to Smith.  McLane, Graf, Raulerson & Middleton, P.A. v. Rechberger, 280 F.3d 26, 39 (1st Cir. 2002).

We begin with the demand letter requirement.  As a prerequisite to suit, Chapter 93A requires that "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent."  Mass. Gen. Laws ch. 93A, § 9(3).  The dual purpose of this requirement is "to encourage negotiation and settlement" and "to operate as a control on the amount of damages."  Slaney v. Westwood Auto, Inc., 322 N.E.2d 768, 779 (Mass. 1975).

argument, we do not address it.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

-37-

Smith addressed a demand letter to Union Capital and mailed it via certified mail to the address of Union Capital's registered agent in Massachusetts, without specifying the registered agent or any other agent of the company as the designated recipient. The registered agent was in jail at the time and his spouse signed the return receipt. The district court found this deficient, reasoning that under Rule 4(d)(2) of the Massachusetts Rules of Civil Procedure, "proper service on a domestic corporation requires delivery to a corporate officer, a managing or general agent, or the person in charge at its principal place of business within the Commonwealth." Smith v. Jenkins, 777 F. Supp. 2d 264, 268 (D. Mass. 2011). The court concluded that Smith failed to comply with the service of process rule and, by extension, the demand letter requirement, because he failed to designate Union Capital's registered agent as the letter's recipient. Id.

No authority has been cited for the proposition that a Chapter 93A demand letter must be served on a defendant in compliance with the Massachusetts service of process rules, and we have found none. In fact, Chapter 93A suggests quite the opposite. All that the statute requires is that a demand letter be "mailed or delivered" to a prospective respondent. In contrast, rules governing service of process are more demanding. See Mass. R. Civ. P. 4. Distinguishing between mailing or delivering a demand letter

and service of process accords with the Massachusetts Business Corporation Law, which specifies that a corporation's registered agent is its agent for "service of process, notice, or demand required or permitted by law to be served on the corporation." Mass. Gen. Laws ch. 156D, § 5.04.

Hence, Smith could serve the demand letter on Union Capital by mailing it to the company's registered agent. Nothing suggests that he had to designate the registered agent as the recipient instead of the corporation. Because Smith complied with the demand letter requirement in this instance, we remand the claim to the district court for a determination on the merits.

With respect to Century 21, Smith mailed two copies of the demand letter via certified mail to "James Adamos c/o Century 21" and to "Ivana Foley c/o Century 21" at Century 21's address.[13] Neither sales agent was employed by Century 21 at the time and the letters were returned unclaimed. Smith followed up by sending the letter to the same addressees via first-class mail. Those letters were not returned to Smith. At no point did Smith mail or deliver a demand letter to Century 21 or to Cahill, its owner, broker, and registered agent, despite the fact that three months before filing

_____

[13] Another copy of the demand letter was sent to "Century 21 of New England, Inc." Smith does not appeal the district court's ruling that this entity was a separate franchise not affiliated with the defendant Century 21.

suit, his counsel learned from Adamos that Cahill was his supervising broker.

The district court concluded that "the sending of the demand letter to two persons that [Century 21] no longer employed . . . does not comply with Chapter 93A." Smith, 777 F. Supp. 2d at 269. We agree. The statute plainly provides that a demand letter must be sent "to any prospective respondent." Mass. Gen. Laws ch. 93A, § 9(3). The respondent was Century 21, not its former sales agents.

Smith would have us hold that mailing the demand letter to former employees ought to be sufficient because "mail addressed to a former employee will very likely be opened by the company that receives it and read." Whatever the merits of this assertion, here there is no evidence that Century 21 opened the letters. On the contrary, the letters sent via certified mail were returned unclaimed, and Cahill attested that she never received or reviewed any demand letter from Smith. Accordingly, the district court correctly granted Century 21's motion for judgment as a matter of law on the Chapter 93A claim.

3. Leave to Amend

After the defendants moved for summary judgment, Smith sought leave to file his second amended complaint to assert claims of breach of fiduciary duty and breach of contract against Union Capital and NEMCO. The district court granted the motion with

respect to the breach of fiduciary duty claim but denied it as to the breach of contract claim. Smith assigns error to the denial, asserting that he had viable breach-of-contract claims against the two mortgage brokers. This challenge lacks merit.

We review denials of motions to amend pleadings for abuse of discretion "and will defer to the district court's hands-on judgment so long as the record evinces an adequate reason for the denial." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 58 (1st Cir. 2006). "Futility of the amendment constitutes an adequate reason to deny the motion to amend." Todisco v. Verizon Commc'ns, Inc., 497 F.3d 95, 98 (1st Cir. 2007).

Smith's amendment was futile because he failed to allege that he entered into a valid contract with either mortgage broker. See Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122, 126 (1st Cir. 2006) (a proffered amendment is futile if it fails to state a claim upon which relief may be granted). What spurred Smith to seek leave to assert the breach-of-contract claims was the discovery of loan origination agreements bearing his signature. The agreements provide that the brokers would "apply for a residential mortgage loan from a lender" on Smith's behalf. Smith alleged that they breached this obligation by entering false information on the loan applications. Assuming that this would constitute a breach, Smith failed to allege "the most elemental prerequisite to the formation of an enforceable contract--the

-41-

meeting of the minds."  <u>Nash</u> v. <u>Trs. of Bos. Univ.</u>, 946 F.2d 960, 966 (1st Cir. 1991).

Not only did Smith fail to allege the existence of valid contracts, but he alleged quite the contrary in his complaint.  The substance of his tort claims (and his unequivocal testimony) was that he signed all the documents because the defendants represented them as paperwork for an "investment" and at no point disclosed to him that he was taking part in mortgage loan transactions.  He thereby alleged "fraud in the factum"--that is, "fraudulent procurement of a party's signature to an instrument without knowledge of its true nature," rendering void any documents he signed.  <u>Fed. Deposit Ins. Corp.</u> v. <u>Caporale</u>, 931 F.2d 1, 2 n.1 (1st Cir. 1991); <u>see</u> <u>Federico</u> v. <u>Brockton Credit Union</u>, 653 N.E.2d 607, 611 (Mass. App. Ct. 1995) (describing fraud in the factum as occurring in "the rare case when there has been fraud as to the essential nature of the instrument or an essential element of it," such as "the case of someone tricked into signing a note in the belief that the paper is a receipt").

At its core, fraud in the factum signifies "the absence of that degree of mutual assent prerequisite to formation of a binding contract; absent the proverbial 'meeting of the minds' one cannot be said to have obligated himself in law and the purported transaction is regarded as void."  26 Williston on Contracts § 69:4 (4th ed. 2003) (quoting <u>Bancredit, Inc.</u> v. <u>Bethea</u>, 172 A.2d 10, 12

(N.J. Super. Ct. App. Div. 1961)).  Because Smith alleged that the defendants coaxed him into signing the loan agreements by representing them as "investment" documents, he effectively alleged that the contracts were void.  It was therefore well within the district court's discretion to deny leave to amend.[14]

4.  Emotional Distress Claim

Finally, Smith contends that the district court erred in granting summary judgment to the defendants on his claim of intentional infliction of emotional distress.  We review the entry of summary judgment de novo, "drawing all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013) (internal quotation marks omitted).

Under Massachusetts law, to prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove, among other elements, that "the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct." Howell v. Enter. Publ'g Co., 920 N.E.2d 1, 28 (Mass. 2010).  Smith alleged

---

[14] A plaintiff may, of course, plead inconsistent theories of relief in the alternative.  See Fed. R. Civ. P. 8(d).  But even if he adequately pleaded the contract claims, Smith prevailed on his tort claims because the jury believed his version of the events-- that he unwittingly borrowed money to purchase the two properties because the defendants defrauded him.  Accordingly, he could not have prevailed on his breach of contract claims as well.

that the defendants knew or should have known that he would suffer emotional distress as a result of their fraud.  The district court concluded that no evidence supported this allegation.

In mounting his challenge, Smith does not cite any record evidence that would bring into question the district court's ruling.  Instead, he cites two studies for the proposition that "there is a significant link between depression and one's financial status."  Even if these studies could show that Smith's emotional distress was foreseeable to the defendants, they were not in the record before the district court.  Save for certain exceptions not applicable here, we do not consider arguments or evidence not presented to the district court.  <u>United States</u> v. <u>Font-Ramirez</u>, 944 F.2d 42, 46 n.2 (1st Cir. 1991).  "Unlike the Emperor Nero, litigants cannot fiddle as Rome burns.  A party who sits in silence [and] withholds potentially relevant information . . . does so at his peril."  <u>Vasapolli</u> v. <u>Rostoff</u>, 39 F.3d 27, 36 (1st Cir. 1994).  Accordingly, we affirm the grant of summary judgment.

## III.

For the aforementioned reasons, we:  (1) vacate the damages award against Century 21 and remand for a new trial on damages; (2) reverse the judgment against NEMCO on Smith's common-law claims; (3) vacate the judgment against NEMCO on Smith's Chapter 93A claim and remand for determination on the merits consistent with this opinion; (4) vacate the judgment in favor of

RKelley-Law and remand for further proceedings; and (5) reverse the dismissal of the Chapter 93A claim against Union Capital and remand for a determination of the claim on the merits.  We affirm in all other respects.

The parties shall bear their own costs of appeal.

**<u>So ordered</u>**.